**No. 26-4551**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

EMILIE JACKSON-EDNEY, et al.,

*Plaintiffs-Appellees,*

v.

RAUL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Idaho
No. 1:26-cv-00261-AKB
Hon. Amanda K. Brailsford

# ANSWERING BRIEF OF PLAINTIFFS-APPELLEES

Emily Croston (ISB No. 12389)
ecroston@acluidaho.org
Paul Southwick (ISB No. 12439)
psouthwick@acluidaho.org
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
(208) 344-9750

Barbara Schwabauer
bschwabauer@aclu.org
Eleanor Matheson
ematheson@aclu.org

Samuel L. Linnet (ISB No. 9788)
sam@alturaslawgroup.com
ALTURAS LAW GROUP, PLLC
111 N 1st Avenue, Suite 2I, PO Box 2975
Hailey, ID 83333
(208) 788-6688

Peter C. Renn
prenn@lambdalegal.org
Kell L. Olson†
kolson@lambdalegal.org
Tara L. Borelli†

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street N.W.
Washington, DC 20005
(212) 549-2500

Chase Strangio
cstrangio@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor New York, NY 10004
(212) 549-2500

Katherine M. Forster
katherine.forster@mto.com
Eduardo A. González
eduardo.gonzalez@mto.com
Kyle A. Groves
kyle.groves@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071-3426
(213) 683-9100

tborelli@lambdalegal.org
Pelecanos†
pelecanos@lambdalegal.org
A.D. Sean Lewis
alewis@lambdalegal.org
Charlie Ferguson†
cferguson@lambdalegal.org
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†*mailing address only*
(213) 382-7600

J. Max Rosen
max.rosen@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ........ 3

STATEMENT OF THE CASE ........ 4

I. TRANSGENDER STATUS AND THE IMPORTANCE OF GENDER IDENTITY-ALIGNED RESTROOMS ........ 4

II. THE TEXT AND PASSAGE OF HOUSE BILL 752. ........ 5

III. THE IMPACT OF H.B. 752 ON PLAINTIFFS ........ 9

IV. PROCEDURAL HISTORY ........ 11

STANDARD OF REVIEW ........ 14

SUMMARY OF ARGUMENT ........ 15

ARGUMENT ........ 17

I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY CONCLUDING THAT PLAINTIFFS DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS. ........ 18

A. The district court correctly ruled that Plaintiffs are likely to succeed on the merits of their void-for-vagueness claim. ........ 18

1. H.B. 752's exceptions are unconstitutionally vague. ........ 19

(a) H.B. 752's "reasonably available" exception is impermissibly vague. ........ 19

(b) The "dire need" exception is unconstitutionally vague. ........ 23

(c) H.B. 752's exceptions also fail to provide fair notice. ........ 26

2. The district court did not err in declining to sever H.B. 752's vague exceptions, which would have expanded the law's reach. ........ 27

3. H.B. 752's core prohibition separately fails to provide notice or adequate standards for enforcement. ........ 29

(a) Basing the law's prohibition on "biological sex" invites arbitrary and discriminatory enforcement. .........30

(b) H.B. 752 does not provide sufficient notice of which restrooms are "designated" under the statute. ..........31

B. This Court need not reach Plaintiffs' remaining constitutional claims and can remand to the district court. ..........34

C. Plaintiffs are likely to succeed on the merits of their Equal Protection Clause claim. ..........35

1. Heightened scrutiny applies to H.B. 752 as a sex- and transgender status-based classification. ..........35

2. Plaintiffs' claim for narrow injunctive relief is proper. ..........38

3. Defendants cannot show H.B. 752's restroom restriction is substantially related to safety and privacy interests. ..........40

4. H.B. 752 was motivated by animus. ..........44

D. Plaintiffs are likely to succeed on the merits of their informational privacy claim. ..........46

1. The informational privacy right extends to a person's transgender status. ..........46

2. H.B. 752 infringes the right to informational privacy by forcing disclosure of transgender status. ..........48

II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVORED AN INJUNCTION. ..........51

A. The district court correctly ruled that Plaintiffs will suffer irreparable harm. ..........51

B. The district court correctly ruled that the balance of hardships and the public interest favor an injunction. ..........52

III. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS HAVE STANDING ON BEHALF OF THE CLASS TO SUE ALL COUNTY PROSECUTOR DEFENDANTS. ..........54

IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN PROVISIONALLY GRANTING CLASS CERTIFICATION. ..........58

A. The district court did not err in defining the class. ..........58

B. The district court did not err in finding the class satisfied Rule 23(a)'s commonality requirement. ....................................................60

CONCLUSION ....................................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A.C. v. Metropolitan School District of Martinsville*,
75 F.4th 760 (7th Cir. 2023) ....................35

*Adams ex rel. Kasper v. School Board of St. John's County*,
57 F.4th 791 (11th Cir. 2022) (en banc) ....................36

*Alliance for the Wild Rockies v. Petrick*,
68 F.4th 475 (9th Cir. 2023) ....................17

*American Encore v. Fontes*,
152 F.4th 1097 (9th Cir. 2025) ....................14

*American Trucking Association, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ....................53

*In re Amy*,
714 F.3d 1165 (9th Cir. 2013) ....................36

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014) ....................14

*Arroyo Gonzalez v. Rossello Nevares*,
305 F. Supp. 3d 327 (D.P.R. 2018) ....................48

*Barr v. American Association of Political Consultants, Inc.*,
591 U.S. 611 (2020) ....................29

*Bennett v. Isagenix International LLC*,
118 F.4th 1120 (9th Cir. 2024) ....................34

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ....................59

*Brockett v. Spokane Arcades, Inc.*,
472 U.S. 491 (1985)....................29

*Chalk v. U.S. District Court Central District of California*,
840 F.2d 701 (9th Cir. 1988) ....................51

*City of Chicago v. Morales*,
527 U.S. 41 (1999)....................22, 23, 24

*In re Crawford*,
194 F.3d 954 (9th Cir. 1999) ....................46, 47

*Department of Comm. v. New York*,
588 U.S. 752 (2019)....................50

*Doe #1 by Doe #2 v. Mukwonago Area School District*,
No. 23-cv-876, 2026 WL 2640979 (E.D. Wisc. Sept. 8, 2026) ....................36

*Doe #1 v. Trump*,
335 F.R.D. 416 (D. Or. 2020)....................59

*Doe v. Bonta*,
101 F.4th 633 (9th Cir. 2024) ....................46

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ....................17

*DZ Rsrv. v. Meta Platforms, Inc.*,
96 F.4th 1223 (9th Cir. 2024) ....................14

*Easter v. American W. Fin.*,
381 F.3d 948 (9th Cir. 2004) ....................56

*F.V. v. Barron*,
286 F. Supp. 3d 1131 (D. Idaho 2018) ....................49

*Forbes v. Napolitano*,
236 F.3d 1009 (9th Cir. 2000) ....................18, 24, 27, 31

*Gore v. Lee*,
107 F.4th 548 (6th Cir. 2024) ....................49, 50

*Grimm v. Gloucester County School Board*,
972 F.3d 586 (4th Cir. 2020) ....................35

*Hill v. Colorado*,
530 U.S. 703 (2000)....................18

*International Franchise Association, Inc. v. City of Seattle*,
803 F.3d 389 (9th Cir. 2015) ........................................................................17

*Jabbari v. Farmer*,
965 F.3d 1001 (9th Cir. 2020) ......................................................................14

*Kadel v. Folwell*,
100 F.4th 122 (4th Cir. 2024) .......................................................................59

*Kallstrom v. Columbus*,
136 F.3d 1055 (6th Cir. 1998) ..................................................................47, 49

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ......................................................................36

*Kashem v. Barr*,
941 F.3d 358 (2019)......................................................................................22

*Kolender v. Lawson*,
461 U.S. 352 (1983)......................................................................................18

*La Mar v. H & B Novelty & Loan Co.*,
489 F.2d 461 (9th Cir. 1973) ...........................................................56, 57, 58

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
941 F.2d 970 (9th Cir. 1991) ........................................................................14

*Lerwill v. Inflight Motion Pictures, Inc.*,
582 F.2d 507 (9th Cir. 1978) ........................................................................58

*Livsey v. Salt Lake Cnty.*,
275 F.3d 952 (10th Cir. 2001) ......................................................................47

*Love v. Johnson*,
146 F. Supp. 3d 848 (E.D. Mich. 2015) .......................................................48

*Martinez v. Newsom*,
46 F.4th 965 (9th Cir. 2022) .....................................................................56, 57

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ....................................................................51, 53

*Mullins v. Direct Digit., LLC*,
795 F.3d 654 (7th Cir. 2015) ....................................................................58

*Olmstead v. United States*,
277 U.S. 438 (1928).....................................................................................47

*Pacific Radiation Oncology, LLC v. Queen's Medical Center*,
810 F.3d 631 (9th Cir. 2015) ....................................................................39

*Panther v. Hames*,
991 F.2d 576 (9th Cir. 1993) ....................................................................33

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020) ............................................................42, 44

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ....................................................................60

*Payton v. Cnty. of Kane*,
308 F.3d 673 (7th Cir. 2002) ...............................................................55, 56

*Personnel Administration of Massachusetts v. Feeney*,
442 U.S. 256 (1979).....................................................................................45

*PFLAG, Inc. v. Trump*,
769 F. Supp 3d 405 (D. Md. 2025)..............................................................46

*Planned Parenthood of Greater Washington & Northern Idaho v. U.S. Department of Health & Human Services*,
946 F.3d 1100 (9th Cir. 2020) ......................................................24, 31, 34

*Planned Parenthood of Idaho, Inc. v. Wasden*,
376 F.3d 908 (9th Cir. 2004) ....................................................................28

*Porretti v. Dzurenda*,
11 F.4th 1037 (9th Cir. 2021) ....................................................................53

*Powell v. Schriver*,
175 F.3d 107 (2d Cir. 1999) ...........................................................47, 48, 52

*Probe v. State Teachers' Retirement System*,
780 F.2d 776 (9th Cir. 1986) ....................................................................60

*Ray v. McCloud*,
507 F. Supp. 3d 925 (S.D. Ohio 2020) ....................48

*Rodriguez v. AT & T Mobility Servs. LLC*,
728 F.3d 975 (9th Cir. 2013) ....................36

*Roe v. Critchfield*,
137 F.4th 912 (9th Cir. 2025) .................... 35, passim

*Roe v. Sherry*,
91 F.3d 1270 (9th Cir. 1996) ....................50

*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) ....................58

*Romer v. Evans*,
517 U.S. 620 (1996)....................45

*Roth v. Foris Ventures, LLC*,
86 F.4th 832 (9th Cir. 2023) ....................34

*Sessions v. Dimaya*,
584 U.S. 148 (2018)....................21

*Sessions v. Morales-Santana*,
582 U.S. 47 (2017)....................29, 40

*Shelton v. Bledsoe*,
775 F.3d 554 (3d Cir. 2015) ....................59

*Smith v. Goguen*,
415 U.S. 566 (1974)....................18

*Stockwell v. City & County of San Francisco*,
749 F.3d 1107 (9th Cir. 2014) ....................61

*Tucson v. City of Seattle*,
91 F.4th 1318 (9th Cir. 2024) ....................26

*Tucson Woman's Clinic v. Eden*,
379 F.3d 531 (9th Cir. 2004) ....................46

*Uber Technologies, Inc. v. City of Seattle*,
168 F.4th 1202 (9th Cir. 2026) .......... 14

*United States v. Davis*,
588 U.S. 445 (2019) .......... 28

*United States v. Kravetz*,
706 F.3d 47 (1st Cir. 2013) .......... 47

*United States v. Lucero*,
989 F.3d 1088 (9th Cir. 2021) .......... 18

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 40

*United States v. Skrmetti*,
605 U.S. 495 (2025) .......... 36, 37

*United States v. Virginia*,
518 U.S. 515 (1996) .......... 40, 44

*United States v. Williams*,
553 U.S. 285 (2008) .......... 18, passim

*Van v. LLR, Inc.*,
61 F.4th 1053 (9th Cir. 2023) .......... 14

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 60, 61

*Washington v. Davis*,
426 U.S. 229 (1976) .......... 44

*Washington v. Trump*,
768 F. Supp. 3d 1239 (W.D. Wash. 2025) .......... 46

*West Virginia v. B.P.J. by Jackson*,
146 S. Ct. 2356 (2026) .......... 36, 37, 38, 39

*Whitlock v. Johnson*,
153 F.3d 380 (7th Cir. 1998) .......... 55

*Yaffe v. Powers*,
454 F.2d 1362 (1st Cir. 1972)....................59

**STATE CASES**

*Boundary Backpackers v. Boundary County*,
128 Idaho 371 (1996)....................27

*People v. Liberta*,
64 N.Y.2d 152 (1984)....................29

*In re SRBA Case No. 39576*,
912 P.2d 614 (Idaho 1995)....................29

**FEDERAL STATUTES**

28 U.S.C. § 1292(a)....................3

28 U.S.C. § 1331....................2

28 U.S.C. § 1343....................2

42 U.S.C. § 1983....................3

**STATE STATUTES**

Idaho Ann. Code § 18-901....................41

Idaho Ann. Code § 18-903....................41

Idaho Ann. Code § 18-924....................41

Idaho Ann. Code § 18-4116....................41

Idaho Ann. Code § 18-4117(2)....................6

Idaho Ann. Code § 18-4117(2)(e)....................6, 19

Idaho Ann. Code § 18-4117(2)(f)....................6, 19

Idaho Ann. Code § 18-6101....................41

Idaho Ann. Code § 18-6409....................41

Idaho Ann. Code § 18-7008....................8, 41

Idaho Ann. Code § 67-5902(9) .......... 5

Idaho Ann. Code § 73-114(2)(c), (g) .......... 31

Idaho Code Ann. § 18-4117 .......... 9

Idaho Code Ann. § 18-4117(1) .......... 5, 6, 30

Idaho Code Ann. § 31-227 .......... 58

Idaho Code Ann. § 31-2604(1) .......... 58

Idaho Code Ann. § 33-6705(2) .......... 20

Idaho Code Ann. § 67-9801(5), (7), (10) .......... 31

Idaho Code Ann. § 67-9802(1), (2) .......... 31

Idaho Code Ann. § 67-9802(6) .......... 20

**FEDERAL RULES OF CIVIL PROCEDURE**

Rule 23 .......... 3, passim

Rule 23(a) .......... 60

Rule 23(a)(2) .......... 60

Rule 23(b)(2) .......... 12, 17, 59, 60

Rule 23(b)(3) .......... 56, 58, 59

**CONSTITUTIONAL PROVISIONS**

Fourteenth Amendment .......... 46, 47

**LEGISLATIVE MATERIALS**

Idaho House Bill 752 .......... 1, 8

**TREATISES**

Black's Law Dictionary (12th ed. 2024) .......... 32, 33

### OTHER AUTHORITIES

Becca Savransky, Alex Brizee, How will Idaho enforce new bathroom law? It will be tricky, they say, Idaho Statesman (July 24, 2026), https://www.idahostatesman.com/news/politics-government/state-politics/article316522264.htm ........................................................................31

## INTRODUCTION

Idaho House Bill 752 ("H.B. 752") is a far-reaching and harshly punitive solution in search of a problem. For transgender people, it criminalizes the ordinary and essential conduct of "entering" a public restroom. No other Idahoans are risking imprisonment by simply using public restrooms consistent with their gender identity as they always have. Not only does H.B. 752 upend the lives of transgender people, it also creates a risk of harassment for any Idahoan based on their appearance (regardless of gender identity) if they look like they do not belong. H.B. 752 replaced the longstanding status quo for restroom use in Idaho with an impermissibly vague regime that invites arbitrary and discriminatory enforcement. The law provides no standards or objective criteria for determining when entering a public restroom becomes a criminal act. Even major law enforcement organizations agree these flaws will make H.B. 752 difficult to enforce consistently.

For transgender people navigating these challenges, H.B. 752 not only excludes them from public restrooms but also from public life. The law extends to nearly all public spaces—government-owned buildings and places of public accommodation, including restaurants, theaters, banks, gas stations, and stores—ensuring that no transgender person can live, work, or travel in Idaho without being harmed by H.B. 752. As a result, transgender people like Plaintiffs-Appellees must

regularly confront an impossible dilemma: continue using public restrooms aligned with their gender identity and face *imprisonment*; or comply with H.B. 752 and face *harassment, hostility, even violence* for appearing out of place in restrooms aligned with their birth-assigned sex.

Defendants-Appellants claim that H.B. 752's devastating consequences for transgender people are a small price to pay for safety and privacy. But H.B. 752 inflicts these harms without advancing those interests. Excluding transgender women from women's restrooms does not prevent violent male predators from "claiming to be transgender" to access those spaces—one of the purported reasons for the law—any more than the status quo. The law only changes the label: instead of claiming to be transgender women, they can now claim to be transgender men. The law also does not offer more privacy in public restrooms than stalls already provide. Given this, H.B. 752 serves the public interest only if one somehow accepts that transgender people are more likely to commit crimes and to violate others' privacy. But there is no evidence to support that notion and the Constitution does not countenance laws premised on harmful stereotypes.

Accordingly, the district court did not abuse its discretion by preliminarily enjoining Defendants from enforcing certain applications of H.B. 752.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343

because this action arises under 42 U.S.C. § 1983. *See* 2-ER-214. This Court has jurisdiction under 28 U.S.C. § 1292(a) for interlocutory review of the district court's order granting Plaintiffs-Appellees' request for a preliminary injunction issued in this case. 1-ER-29-30.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I. Whether the district court abused its discretion in granting a preliminary injunction partially enjoining Defendants' enforcement of H.B. 752 because (A) the court correctly found that Plaintiffs are likely to succeed on the merits of their claim that H.B. 752 is void-for-vagueness under the Due Process Clause; or (B) if this Court reaches the additional constitutional claims on which the district court reserved decision, because Plaintiffs have shown a likelihood of success on the merits of their claims that H.B. 752 violates (1) the Equal Protection Clause by impermissibly discriminating based on sex and transgender status and (2) the Due Process Clause by infringing on Plaintiffs' right to informational privacy.

II. Whether the district court abused its discretion in granting the partial preliminary injunction because it correctly held that Plaintiffs have shown irreparable harm and the balance of equities favors a preliminary injunction.

III. Whether the district court abused its discretion in granting class certification under Federal Rule of Civil Procedure 23 (1) by defining the class as "all transgender people who seek to use a restroom in a government-owned

building or place of public accommodation in Idaho consistent with their gender identity" and (2) by finding the class satisfied Rule 23's commonality requirement.

IV. Whether the district court properly ruled that Plaintiffs have standing to sue all forty-four County Prosecutor Defendants.

## STATEMENT OF THE CASE

### I. TRANSGENDER STATUS AND THE IMPORTANCE OF GENDER IDENTITY-ALIGNED RESTROOMS

Transgender people are individuals whose sex assigned at birth differs from their gender identity. 2-SER-479.[1] "Sex assigned at birth" is a person's sex as noted on a birth certificate shortly after birth and typically based on the appearance of the infant's external genitalia. *Id*. The term "gender identity" is a well-established medical term, referring to an individual's innate, internal sense of self as belonging to a particular gender. *Id*.

For some transgender people, the mismatch between their gender identity and sex assigned at birth results in "gender dysphoria," which is a serious medical condition characterized by clinically significant distress associated with one's sex assigned at birth. 2-SER-479-80. Gender dysphoria can be significantly alleviated, and in many cases resolved, through social transition and medical treatment. 2-SER-483, 2-SER-485-86. Social transition refers to the process by which a

---

[1] SER refers to Plaintiffs-Appellees' Supplemental Excerpts of Record.

transgender person brings their appearance and lived experience into alignment with their gender identity. 2-SER-485. Social transition often includes changes in clothing, name, pronouns, hairstyle, and using sex-separated facilities, such as restrooms, consistent with gender identity. *Id*. Decades of scholarship in clinical psychology recognize that social transition can meaningfully reduce gender dysphoria symptoms. *Id*.

By contrast, forcing transgender people into restrooms based on their sex assigned at birth results in increased symptoms of gender dysphoria, including anxiety, depression, and suicidality. 2-SER-490. These symptoms can leave transgender people unable to function in their work, social, or family lives. 2-SER-489-90. Transgender people also face an elevated risk of harassment and assault when forced to use public restrooms based on their sex assigned at birth, which are inconsistent with how they live and are perceived. 2-SER-488-491.

## II. THE TEXT AND PASSAGE OF HOUSE BILL 752.

H.B. 752 prohibits "knowingly and willfully enter[ing] a restroom…in a government-owned building or a place of public accommodation…that is designated for use by the opposite biological sex." Idaho Code Ann. § 18-4117(1). H.B. 752 applies to places of public accommodations (§ 67-5902(9)), including restaurants, doctor offices, theaters, museums, banks, gas stations, and stores. It also applies to all government-owned buildings, including state courthouses,

libraries, city halls, local and state parks, and Idaho's Capitol Building. A first offense under H.B. 752 is a misdemeanor, punishable by up to one year of imprisonment. *See* § 18-4117(1). A subsequent offense within five years is a felony punishable by up to five years of imprisonment. *Id*. The statute does not define the terms "designated" or "biological sex," nor does it require businesses or government-owned buildings to "designate" any restrooms by "biological sex" with signage or otherwise.

There are ten exceptions to H.B. 752 that allow an individual to enter a restroom designated for the opposite sex in certain circumstances. *Id*. § 18-4117(2). Two are relevant here. The "reasonably available" exception permits an individual to "use a single-user facility designated for the opposite sex, if such single-user facility is the only facility reasonably available at the time of the person's use of the facility." *Id*. § 18-4117(2)(e). The "dire need" exception permits a person to "use restroom facilities when the person is in dire need of urinating or defecating and such facility is the only facility reasonably available at the time of the person's use." *Id*. § 18-4117(2)(f). H.B. 752 does not include definitions of "dire need" or "reasonably available."

During the legislature's consideration of H.B. 752, a bipartisan group of legislators and the public voiced serious concerns about the law. They criticized H.B. 752 as excessively punitive with "pretty severe penalties." 1-SER-115 (Sen.

Guthrie (R)). One legislator observed that "throw[ing] someone in jail, in prison for five years for being in the bathroom" seems "over the edge." 1-SER-112 (Rep. Handy (R)).

Meanwhile, some of Idaho's most prominent law enforcement groups voiced concern about the necessity, clarity, and enforceability of H.B. 752. Anthony Dahlinger, representing the Idaho Chiefs of Police Association ("ICOPA"), testified that H.B. 752 "would place an unrealistic and absurd burden on Idaho law enforcement officers to somehow know, or be able to readily identify visually [the] biological sex of another human being." 1-SER-117. Representing the Idaho Fraternal Order of Police ("IFOP"), Bryan Lovell similarly testified that the process of enforcing this law "could be very invasive and intrusive" and that it is "not reasonable" to expect law enforcement to "make people undress and check" for a person's biological sex. 1-SER-118-19.

The Idaho Sheriffs Association ("ISA") asked the legislature to amend H.B. 752 because, "[f]rom a practical law enforcement perspective, when a deputy arrives on scene it is important that the elements of the offense are clearly defined." 1-SER-135. ISA advocated for adding a duty-to-depart provision, which "would provide clearer guidance to responding deputies regarding what specific conduct constitutes a violation." *Id.*

These groups also identified several problems with H.B. 752's exceptions,

including a lack of sufficient guidelines for enforcement. IFOP stated that "the bill includes exceptions that would be extremely difficult for officers to evaluate in real time." 1-SER-133. For example, IFOP found "[i]t is unclear how an officer responding to a call would reasonably determine whether someone was truly in 'dire need,' creating an unenforceable standard that places officers in a difficult position." *Id*. Finally, IFOP emphasized that "[c]reating a new criminal offense that hinges on determining biological sex and subjective conditions such as 'dire need' will likely create confusion [and] place officers in uncomfortable and legally uncertain situations […]." *Id*.

Law enforcement groups also opposed the bill because existing Idaho law adequately protects against harmful conduct in restrooms. ICOPA testified "that House Bill 752 would create unnecessary law" because "Idaho code 18-7008 [(criminal trespass)] currently gives private citizens and Idaho law enforcement the means in which to address and remedy an individual[']s unwanted and disruptive presence on public or private property." 1-SER-117. IFOP agreed that "Idaho law already provides tools to address inappropriate or disruptive behavior in restrooms…through existing statutes such as trespass or other criminal offenses." 1-SER-133. According to IFOP, "[t]hese [existing] laws [already] allow officers to address situations where someone refuses to leave a facility or is creating a disturbance without requiring officers to make determinations about a person's

gender or if they had a 'dire need.'" *Id*.

The legislature dismissed these concerns. Representative Rasor, who sponsored H.B. 752, stated that it was not "necessary for [him] to write an arrest procedure" for the bill, and that the legislature should "leave that to the discretion" of law enforcement. 1-SER-108.

On March 31, 2026, Governor Brad Little signed H.B. 752 into law without any changes addressing these bipartisan concerns over its severe penalties and unenforceability. 2-ER-152. H.B. 752 is codified as Idaho Code § 18-4117 under "crimes and punishments" for "indecency and obscenity." 2-ER-229.

## III. THE IMPACT OF H.B. 752 ON PLAINTIFFS

Plaintiffs are transgender Idahoans who live in Idaho and simply want to continue using restrooms that align with their gender identity like they have done without incident for years. Without the preliminary injunction, Plaintiffs would be prevented from going about their daily lives.

Emilie Jackson-Edney is a 77-year-old transgender woman who, prior to H.B. 752, exclusively used women's restrooms for two decades. 2-ER-179. Emilie often cannot locate gender-neutral restrooms in her daily life; for example, there are no gender-neutral restrooms when she goes to movies, shops at the mall, or visits other businesses. 2-ER-179–180.

Amelia Milette is a transgender woman and lifelong Idahoan who began

exclusively using women's restrooms six years ago. 2-ER-195. Amelia is frequently unable to locate a gender-neutral restroom in her daily life; for example, there are no gender-neutral restrooms in many businesses she visits for work or in local stores she frequents. 2-ER-195–196.

Zoey Wagner is a transgender woman and Idahoan of 28 years who began exclusively using women's restrooms two years ago. 2-ER-205. Zoey is on medication that causes frequent trips to the restroom. 2-ER-206. She is often unable to find a gender-neutral restroom in her daily life; for example, there are no gender-neutral restrooms at her workplace or many businesses she visits daily or weekly. 2-ER-205–206. Emilie, Amelia, and Zoey express themselves in feminine ways and are perceived by others as women. 2-ER-180; 2-ER-196; 2-ER-206.

Peter Poe is a transgender man and Idahoan of 25 years who began exclusively using men's restrooms over a decade ago. 2-ER-200. Peter is often unable to locate gender-neutral restrooms in his daily life; for example, there are no gender-neutral restrooms at a building that he must enter daily for work or in many businesses he frequents. 2-ER-200.

Daniel Doe is a transgender man and Idahoan of 30 years who, prior to H.B. 752, exclusively used men's restrooms for years without issue. 2-ER-184. Daniel wears a medical device that he occasionally needs to adjust while he is out in public, and he does so in men's restrooms. 2-ER-185. He is often unable to locate a

gender-neutral restroom while living his daily life; for example, there is no gender-neutral restroom accessible when he visits his wife at the local hospital or at many businesses he frequents. 2-ER-184. Daniel and Peter express themselves as male, including growing facial hair in Daniel's case, and are perceived by others as men. 2-ER-185; 2-ER-201.

All Plaintiffs fear that if they are forced to use restrooms incongruent with their gender identity and outward appearance, they will experience violence, harassment, unwanted attention, and other harm. 2-ER-180; 2-ER-185; 2-ER-196; 2-ER-201; 2-ER-206. To moderate these outcomes, Plaintiffs would attempt to reduce their need to use restrooms in government buildings and places of public accommodation by reducing their liquid and food consumption, 2-ER-180; 2-ER-196; spending less time in public, 2-ER-206; or avoiding public restrooms altogether, 2-ER-191; 2-ER-201.

Because H.B. 752 applies to virtually all public places in Idaho, all transgender people who reside in or visit Idaho will confront this law.

## IV. PROCEDURAL HISTORY

Plaintiffs filed suit in federal district court against Idaho Attorney General Raúl Labrador and Idaho's forty-four County Prosecutors to challenge H.B. 752's restroom restriction as it applies to transgender people.[2]

---

[2] Plaintiffs challenge H.B. 752 only as it relates to restrooms.

Contemporaneously, Plaintiffs requested a preliminary injunction that would permit them to use any single-user restroom and to use multi-user restrooms designated for the opposite sex assigned at birth when no single-user restroom exists on the same floor or all single-user restrooms on the same floor are occupied or not in service. 2-ER-140. They also sought certification of a class of all transgender people who seek to use restrooms in government-owned buildings or places of public accommodation in Idaho consistent with their gender identity. 2-ER-140–141. Defendants opposed, and the County Prosecutor Defendants additionally challenged Plaintiffs' standing as to all forty-four County Prosecutors.

The district court granted Plaintiffs' motions. 1-ER-2–31. The court first held that Plaintiffs have standing to seek injunctive relief against all forty-four County Prosecutors. 1-ER-7–10. It also certified a Rule 23(b)(2) class of all transgender people who seek to use restrooms consistent with their gender identity in government-owned buildings or places of public accommodation in Idaho. 1-ER-30. The court found that Plaintiffs satisfied "the disputed prerequisites": (1) commonality because each class member is at risk of "exactly the same constitutional injury" 1-ER-25; (2) typicality because "the named Plaintiffs and each proposed class member are all subject to the same statutory scheme and face the same alleged constitutional injury," 1-ER-26; and (3) Plaintiffs' adequacy as class representatives because "[t]he interest in protecting one's access to their

chosen restroom is shared by the class members." 1-ER-28.

Under the preliminary injunction factors, the district court first held that Plaintiffs "demonstrated a likelihood of success" on the merits of their vagueness claim. 1-ER-11–19. The court determined that H.B. 752's "'reasonably available' and 'dire need' exceptions "invite[] arbitrary and discriminatory enforcement," 1-ER-16, by "fail[ing] to provide the minimal guidelines necessary to constrain official discretion," thereby violating the Due Process Clause. 1-ER-17. Because both exceptions are critical to the law's criminal reach and express the legislature's intent "to allow a person to enter a restroom designated for use by the opposite sex under certain circumstances," the court ruled that they were not severable from H.B. 752. 1-ER-23. The court also observed that Plaintiffs have been entering restrooms aligned with their gender identity for years; H.B. 752 does not require establishments to "designate restrooms for use by a biological sex"; and "signage for men and women does not necessarily mean the establishment intends to limit its restrooms' use to biological sex." 1-ER-18.

The district court did not reach Plaintiffs' equal protection and informational privacy claims. In considering the remaining factors, the court found that Plaintiffs would be irreparably harmed by the constitutional violation and that the balance of equities favored issuing an injunction. 1-ER-18-19.

Defendants appealed from the judgment.

## STANDARD OF REVIEW

***Preliminary Injunction.*** This Court reviews a district court's grant of a preliminary injunction for an abuse of discretion. This review is "limited and deferential." *Uber Techs., Inc. v. City of Seattle*, 168 F.4th 1202, 1211 (9th Cir. 2026) (citation omitted). A district court has "considerable discretion in fashioning suitable relief and defining the terms of an injunction," and "[a]ppellate review of those terms is correspondingly narrow." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (cleaned up). While a district court's legal conclusions are reviewed de novo, factual findings are reviewed for clear error. *Armstrong v. Brown*, 768 F.3d 975, 979 (9th Cir. 2014).

***Standing*****.** This Court reviews a district court's determination of a plaintiff's standing de novo. *American Encore v. Fontes*, 152 F.4th 1097, 1109 (9th Cir. 2025).

***Provisional Class Certification.*** A provisional class certification order is reviewed for an abuse of discretion. *Van v. LLR, Inc.*, 61 F.4th 1053, 1062 (9th Cir. 2023). When reviewing an order *granting* class certification, this Court "accord[s] the district court noticeably more deference than when [it] review[s] a denial." *Jabbari v. Farmer*, 965 F.3d 1001, 1005 (9th Cir. 2020). The district court's legal conclusions are reviewed *de novo* and its factual findings for clear error. *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1232 (9th Cir. 2024).

## SUMMARY OF ARGUMENT

***Preliminary injunction.*** The district court did not abuse its discretion by enjoining Defendants from enforcing H.B. 752 against transgender people when: (1) the covered restroom is a single-user facility; and (2) in the context of multi-user restrooms, when no single-user restroom exists on the same floor or is occupied or not in service.

***Likelihood of success on the merits.*** The district court correctly held that Plaintiffs were likely to succeed on their void-for-vagueness challenge to H.B. 752's "reasonably available" and "dire need" exceptions. These exceptions lack any meaningful standards to cabin law enforcement's discretion, inviting arbitrary and discriminatory enforcement.

The district court did not rule on Plaintiffs' remaining constitutional claims, and for that reason, this Court need not reach them. However, Plaintiffs have also established a likelihood of success on their equal protection and informational privacy claims. Accordingly, this Court can affirm the injunction on either basis.

Plaintiffs are likely to succeed on their claim that H.B. 752's restroom restriction violates the Equal Protection Clause. Circuit precedent dictates that H.B. 752 is a sex- and transgender status-based classification, and Defendants concede heightened scrutiny applies. Defendants, however, cannot show that H.B. 752's exclusion of transgender people from restrooms aligned with their gender identity

substantially advances the safety and privacy interests they assert. H.B. 752 also fails to pass constitutional muster because it was motivated by animus and disapproval of transgender people.

Plaintiffs are also likely to succeed on their claim that H.B. 752 compels disclosure of their transgender status, violating their right to informational privacy. The law forces transgender people into restrooms that do not align with their gender identity, thus coercing the disclosure of their transgender status when they use a mismatched restroom or have to prove they are in the correct restroom.

***Irreparable harm and equitable factors.*** The district court properly held that the deprivation of Plaintiffs' constitutional rights itself constitutes irreparable harm justifying the preliminary injunction. H.B. 752 also irreparably harms Plaintiffs by causing adverse physical and mental health consequences and increasing their risk of facing harassment and violence. Finally, the balance of equities favored a preliminary injunction because Plaintiffs' injuries cannot be adequately remedied with damages, and Defendants' public safety and privacy justifications do not outweigh H.B. 752's threat to Plaintiffs' health and safety.

***Standing.*** This Court should affirm that Plaintiffs have standing to sue all forty-four County Prosecutor Defendants. Although they do not live and work in all counties, Plaintiffs have standing to sue all Defendants over the threat of enforcement. Daniel Doe has expressed that he travels in Idaho and could need

public restrooms in other counties. Plaintiffs also have standing because they represent a statewide class. Finally, they also have standing because the County Prosecutor Defendants all share a legal relationship as public officials in Idaho tasked with enforcing the exact same law.

***Class Certification.*** The district court did not abuse its discretion in granting provisional class certification for purposes of obtaining injunctive relief. Plaintiffs are not required to show "definiteness" or "ascertainability" as a Rule 23(b)(2) class. The class also satisfies commonality because Plaintiffs and absent class members share the same constitutional injury and the common legal question as to whether H.B. 752 is unconstitutionally vague.

## ARGUMENT

To obtain a preliminary injunction, Plaintiffs must show "(1) [they are] likely to succeed on the merits of [their] claim[s], (2) [they are] likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of hardships tips in [their] favor, and (4) a preliminary injunction is in the public interest." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015). "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). A court may also grant a preliminary injunction when the moving party shows "serious questions going to the merits," if the balance of hardships "tips sharply" in the moving party's favor. *Alliance for the*

*Wild Rockies v. Petrick*, 68 F.4th 475, 490-91 (9th Cir. 2023). Because Plaintiffs demonstrated their entitlement to relief under either standard, the district court did not abuse its discretion by granting Plaintiffs' request for a partial preliminary injunction.

## I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY CONCLUDING THAT PLAINTIFFS DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. The district court correctly ruled that Plaintiffs are likely to succeed on the merits of their void-for-vagueness claim.

A criminal statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited," *United States v. Williams*, 553 U.S. 285, 304 (2008), or invites "arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). The latter test is "the more important aspect of vagueness doctrine." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). Without enforcement guidelines, "a criminal statute may permit 'a standardless sweep'" for police officers "to pursue their personal predilections." *Id.* (quoting *Smith*, 415 U.S. at 575). When the challenged law imposes criminal penalties, "vagueness review is even more exacting," *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000), drawing the line when there is "an unreasonable amount of indeterminacy or subjectivity" regarding what conduct is prohibited. *United States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021). Applying this standard, the district

court correctly held that H.B. 752 is unconstitutionally vague. 1-ER-19.

### 1. **<u>H.B. 752's exceptions are unconstitutionally vague.</u>**

Plaintiffs challenged two of H.B. 752's exceptions as unconstitutionally vague. The first is H.B. 752's "reasonably available" exception, which permits the "use [of] a single-user facility designated for the opposite sex, if such single-user facility is the only facility *reasonably available* at the time of the person's use of the facility." *Id.* § 18-4117(2)(e) (emphasis added). The second is the "dire need" exception, which applies "when the person is in *dire need* of urinating or defecating and such facility is the only facility reasonably available at the time of the person's use." *Id.* § 18-4117(2)(f) (emphasis added). Because these exceptions provide no standards to prevent arbitrary or discriminatory enforcement of the law, the district court correctly held that they were unconstitutionally vague. 1-ER-19.

#### ***(a) H.B. 752's "reasonably available" exception is impermissibly vague.***

The "reasonably available" exception is impermissibly vague because it fails to define "reasonably available" or provide any "objective criteria" for its application. 1-ER-13. As the district court explained, H.B. 752 invites arbitrary enforcement "on a case-by-case basis" because "[d]ifferent officers could reasonably reach different conclusions regarding identical conduct, not because the facts differ" but because H.B. 752 has "no standards by which those facts are to be evaluated." 1-ER-13.

To illustrate: one person may consider a restroom not reasonably available if it is on a different floor; the other side of the building; or has been occupied for 10 minutes. Another person may draw the line only where the restroom is entirely out of order. As the district court emphasized, the statute nowhere indicates whether "reasonably available" refers to "physical proximity, the presence of an unoccupied restroom on the same floor, the temporary occupancy of a restroom, the functionality of the restroom, or the location of other restrooms." 1-ER-13.

For transgender people, H.B. 752's reasonable availability exception is particularly meaningless without any objective criteria. Prior to H.B. 752, using a public restroom aligned with a transgender person's gender identity was both an *available* and entirely *reasonable* option, given the serious harms transgender people face when forced to use restrooms based on their sex assigned at birth and misaligned with how they are publicly perceived. *See* 2-SER-488-90; 1-SER-65-66. By upending the status quo, the law fundamentally changed what reasonable availability means for transgender people, without clarifying what the law's exception is intended to mean. In enacting similar *civil* restroom laws, the legislature anticipated this confusion and made explicit that use of a restroom of the "opposite sex" would not be "reasonable" where an individual was unable or unwilling to use the restroom of one's birth assigned sex. Idaho Code Ann. §§ 33-6705(2), 67-9802(6). But H.B. 752 offers no such clarity.

Defendants' defense of the statute further demonstrates the absence of clear standards. First, they assert that a "reasonably available" restroom may be "at the public place *or elsewhere*." AOB-22[3] (emphasis added). It is far from clear that a person must assess the availability of restrooms in the building where they are *and also in other buildings*. And if that is right, as Defendants assert, H.B. 752 offers no guidance as to what distance makes an alternate restroom reasonably available or other factors that may matter, such as outdoor conditions.

Defendants also argue that H.B. 752 is not subjective, but instead that "H.B. 752's plain text turns on the *restroom's* readiness for use (i.e., availability), not the *person's* willingness to use it." AOB-14-15. But the statute nowhere even suggests that a person's individual circumstances or characteristics are irrelevant to determining "reasonable availability." This would mean, for example, that a person with a disability making stairs painful to climb must consider a restroom designated for their sex two floors away reasonably available because it is otherwise ready for use. That is obviously unreasonable. And people with a medical condition who can wait only a few minutes to relieve themselves do not know if their condition is an appropriate consideration. True, "[m]any perfectly constitutional statutes use imprecise terms." *Sessions v. Dimaya*, 584 U.S. 148, 159

[3] Cites to "AOB" refer to Defendants-Appellants' Opening Brief ("AOB"). Dkt. 007.1.

(2018); AOB-20. But in such cases, interpretation of the imprecise term is guided by "statutory definitions, narrowing context, or settled legal meanings" that are lacking here. *Williams*, 553 U.S. at 285. Absent such interpretive guidance, an indeterminate criminal standard cannot pass constitutional muster. *Compare*, *e.g.*, *Kashem v. Barr*, 941 F.3d 358, 371-74 (2019) (No Fly List not vague where numerous written criteria governed inclusion on the list and "many" prior judicial decisions provided additional guidance), *with City of Chicago v. Morales*, 527 U.S. 41, 60-64 (1999) (anti-loitering ordinance vague for failing to provide any guidance to assess whether a stationary person had an "apparent purpose").

Citing a list of cases, Defendants argue that other "legal standards" have "withstood vagueness challenges despite not specifying pertinent factors" and requiring discretionary judgment from officers. AOB-19-20. Not one involves a similarly vague and subjective standard in the context of newly criminalized, harmless conduct like entering a public restroom. Instead, each involves routine laws prohibiting conduct harmful to others, including harassment, speech inciting violence, stalking, negligent homicide, and "loud and raucous" noises on public streets. *See* AOB-20 (listing cases).

Nor do the ordinary meanings of the terms "reasonably" and "available" or the fact that "reasonable" may be well understood in other contexts make the phrase any less indeterminate when applied to the use of public restrooms under

H.B. 752. *See Morales*, 527 U.S. at 57 ("[T]he vagueness that dooms this ordinance is not…uncertainty about the normal meaning of 'loitering,' but rather about what loitering is covered by the ordinance.").

***(b) The "dire need" exception is unconstitutionally vague.***

H.B. 752's exception for "dire need" suffers from the same intolerable level of indeterminacy and subjectivity as "reasonably available." This exception also includes a "reasonably available" standard and is therefore vague for the reasons just described. The district court correctly found that the "dire need" requirement itself invites arbitrary enforcement based on the subjective assessment of individual officers. 1-ER-14. H.B. 752 provides no "statutory definitions, narrowing context, or settled legal meanings," *Williams*, 553 U.S. at 306, that speak to a person's relative need to use the restroom. 1-ER-14. Specifically, the court explained that the exception lacks any "objective benchmark," fails to "specify what evidence may establish" dire need, and offers no guidelines for officers to "assess whether the exception applies." 1-ER-14. This holding enjoys strong support: the officers tasked with enforcing H.B. 752 consider it unenforceable. *See* 1-SER-118, 1-SER-135.

In response, Defendants reduce these enforcement concerns to an evidentiary problem resolved by the "reasonable doubt" standard, which protects against arbitrary convictions. AOB-23. But H.B. 752's constitutional defect does

not arise from the difficulty of obtaining convictions. The defect is that—without practical, objective guideposts to measure "dire need"—enforcement of H.B. 752 is wholly subjective, conditioned on only the unbounded discretion of law enforcement. Furthermore, preventing a person's arbitrary *conviction* is not all that due process demands. As the Supreme Court has repeatedly explained, void-for-vagueness doctrine also protects Americans from the unbridled discretion of police officers over a law's enforcement. *See*, *e.g.*, *Morales*, 527 U.S. at 60-64 (holding law constitutionally vague without "sufficiently specific limits on the enforcement discretion of the police," which permits arbitrarily issued dispersal orders). That discretion can deprive a person of due process when they are stopped, arrested, held in detention, and many other circumstances beyond false convictions. And criminal laws—which are all subject to a reasonable doubt standard—are subjected to a *higher* standard of scrutiny. *Forbes*, 236 F.3d at 1011. Clearly, then, the reasonable doubt standard cannot be used to justify a *greater* degree of vagueness in a statute.

Once again, Defendants' arguments concerning H.B. 752's clarity illustrate its indeterminacy. First, they argue that "dire need" obviously reflects "physiological factors such as bladder or rectum fullness." AOB-21. But it is unclear how law enforcement officers could even assess a person's "fullness." Furthermore, "fullness" may give rise to a general "need" to use the restroom

physiologically, but H.B. 752 requires more—it must be "dire." The law is silent about this qualifier and whether it includes the existence of a present or imminent restroom emergency, unique medical or physical circumstances, or experiencing pain. The law also does not "indicate upon whose sensitivity" this assessment depends—the "judge or jury," "arresting officer[s]," or "a hypothetical reasonable [person]." 1-ER-15. Without this guidance, officers have only their own subjective assessment of whether a person's biological need is sufficiently urgent—informed by their *personal* tolerance for needing to use the restroom. *See Williams*, 553 U.S. at 306 (holding criminal law requiring "wholly subjective judgments" of '"annoying' or 'indecent'" conduct unconstitutionally vague).

Defendants also assert that "common experience" provides any necessary guidance: "[e]very person can gauge when th[eir] need is so urgent that it becomes 'dire'" because "[e]very person evaluates the urgency of their need to urinate and defecate *every day*." AOB-21. But it is *not a common experience* to determine whether a need is "dire" enough to risk violating a criminal prohibition that could lead to imprisonment. Even if an individual concludes their own need is dire, that is no guarantee that the exception will apply because "enforcement largely depends on an *officer's* subjective assessment of an individual's physical condition at a particular moment." 1-ER-14.

Finally, Defendants incredibly suggest that the "dire need" exception is not

vague *because* it only applies where a restroom designated for the person's sex is also not "reasonably available." AOB-22. But combining *two* vague standards *worsens* the exception's clarity. Because the exception "lack[s] any ascertainable standard for inclusion and exclusion," it impermissibly "authoriz[es] or encourag[es] the authorities [to] arbitrarily prosecute one class of persons instead of another." *Tucson v. City of Seattle*, 91 F.4th 1318, 1329 (9th Cir. 2024) (cleaned up).

#### *(c) H.B. 752's exceptions also fail to provide fair notice.*

The district court concluded that the "reasonably available" and "dire need exceptions are impermissibly vague because they invite arbitrary and discriminatory enforcement. 1-ER-12-16. That was correct. However, as the court noted, Plaintiffs framed their arguments as "geared toward the fair notice prong of vagueness." 1-ER-13. Although the court did not rely on the fair notice prong, its ruling nevertheless incorporates Plaintiffs' fair notice arguments. Thus, for all the reasons just discussed concerning the indeterminacy and subjectivity inherent to the "reasonably available" and "dire need" standards, the exceptions likewise fail to give "a person of ordinary intelligence fair notice of what is prohibited." *Williams*, 553 U.S. at 304. For either or both reasons, this Court should affirm.

#### 2. **<u>The district court did not err in declining to sever H.B. 752's vague exceptions, which would have expanded the law's reach.</u>**

The district court did not err by declining to sever H.B. 752's vague exceptions, correctly concluding that H.B. 752's vague exceptions are "integral to [the law] because they are key to limiting the scope of criminalized conduct." 1-ER-23. In *Forbes*, this Court affirmed an injunction preventing a law's enforcement where "exceptions built into the statute…create[d] the confusion." 236 F.3d at 1012. The statute there criminalized examining fetal tissue from induced abortions except when necessary for routine pathological examination or for diagnosing medical conditions, but it lacked "standards to focus the statute's reach." *Id.* at 1013.

H.B. 752's prohibition is similarly bounded by vague exceptions: it bars Plaintiffs from using restrooms *unless* they meet standardless exceptions connected to the facility's availability and their level of need. Because H.B. 752 reduces restroom options and increases Plaintiffs' chances of facing a dire need, H.B. 752's vague exceptions are central to the law's function. They cannot be severed without affecting the remaining provisions' intended function and scope, as Idaho law confirms. *See Boundary Backpackers v. Boundary Cnty.*, 128 Idaho 371, 378 (1996) ("[i]f an unconstitutional portion of a statute or ordinance is integral or indispensable, it is not severable."). Moreover, the district court properly credited

the legislature's intent to exempt certain conduct from criminal liability. 1-ER-23; *see Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 935–37 (9th Cir. 2004) (finding severance "defeat[s] the obvious purpose of the relevant provisions by removing indispensable qualifications the Idaho Legislature intended"). The court's primary concern was the risk of increasing the law's criminal reach, 1-ER-23, as reflected by its considering the rule of lenity and the legislature's intent to provide some relief. 1-SER-30-31.

On appeal, Defendants boldly claim that "no such principle exists" when remedying a vague law. AOB-26. Yet the Supreme Court has explained that whether a court expands or narrows a criminal statute to save it implicates "the very same due process and separation-of-powers principles on which the vagueness doctrine itself rests." *United States v. Davis*, 588 U.S. 445, 463-64 (2019). The Court acknowledged that it had "sometimes adopted a *narrower* construction of a criminal statute to avoid having to hold it unconstitutional," but had never *expanded* a statute's reach to save it. *Id.* (emphasis in original). Doing so "would also sit uneasily with the rule of lenity's teaching that [courts should resolve] ambiguities about the breadth of a criminal statute…in the defendant's favor"—a well-established rule founded, "*much like the vagueness doctrine*," on '"the rights of individuals' to fair notice" and the principle that the legislature is vested with the power to punish. *Id.* at 464 (emphasis added).

Disregarding these fundamental principles, Defendants would have the district court re-write H.B. 752 to impose criminal liability for conduct not prohibited by the legislature. They unconvincingly invoke general severability rules that the court acknowledged and properly applied. 1-ER-22. None of the cases Defendants cite requires a federal court to expand a criminal law's scope by removing an exception rather than enjoining its unconstitutional applications.[4] *See, e.g.*, *In re SRBA Case No. 39576*, 912 P.2d 614, 631 (Idaho 1995) (striking portions of civil water rights law); *Barr v. Am. Assoc. of Political Consultants, Inc.*, 591 U.S. 611, 633 (2020) (plurality opinion) (severing "relatively narrow exception" from federal civil restrictions that "d[id] not raise any other constitutional problems"); *Sessions v. Morales-Santana*, 582 U.S. 47, 77 (2017) (noting "preferred rule in the typical case is to extend favorable treatment"); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501-02 (1985) (proper remedy was to narrow overbroad law's scope).

### 3. <u>H.B. 752's core prohibition separately fails to provide notice or adequate standards for enforcement.</u>

A preliminary injunction is further warranted because H.B. 752 fails to

---

[4] Nor do Defendants' state cases mandate such an outcome. AOB-26-27 n.3 (referencing equal protection cases where curing equal protection violation did not invalidate statute as a whole); *e.g. People v. Liberta*, 64 N.Y.2d 152, 172 (1984) (striking marital exemption from forcible rape law, while "recogniz[ing] that a court should be reluctant to expand criminal statutes" to avoid "usurping" legislature's role).

provide fair notice of when a restroom is "designated for use by the opposite biological sex." § 18-4117(1). The law does not define "biological sex," and even if it did, H.B. 752 lacks clear standards to determine which restrooms are so "designated."

***(a) Basing the law's prohibition on "biological sex" invites arbitrary and discriminatory enforcement.***

The district court found that H.B. 752 "invites arbitrary and discriminatory enforcement" based in part on its lack of guidance to officers who are tasked with determining an individual's "biological sex."[5] 1-ER-17. The court relied upon testimony from ICOPA that H.B. 752 "would place an unrealistic and absurd burden on Idaho law enforcement officers to somehow know or be able to readily identify visually the biological sex of another human being." Doc 3-3 at ¶ 19(a). IFOP agreed that "[i]t's not reasonable" to "make people undress and check for those things." *Id.* ¶ 19(b). Although the bill's sponsor suggested that law enforcement officers could rely on DNA testing when enforcing the law, 2-ER-227, the court recognized that Idaho law prohibits such testing absent consent, warrant,

[5] Plaintiffs assumed, for the preliminary injunction stage, that Idaho intended the term "biological sex" to mean a person's sex assigned at birth. 1-ER-153. Plaintiffs did not concede that the term provides sufficient notice or enforcement standards under due process.

or qualifying conviction.[6] 1-ER-17. This leaves officers with only their personal judgment to determine whether any person's presence in a restroom warrants further investigation or arrest.

### *(b) H.B. 752 does not provide sufficient notice of which restrooms are "designated" under the statute.*

H.B. 752 lacks adequate notice or standards in part because it "does not require any establishment to designate restrooms for use by a biological sex." 1-ER-18. Unlike its civil predecessors, H.B. 752 requires only that, if the restroom *is* so designated, H.B. 752's restrictions apply. By contrast, Idaho's 2023 and 2025 civil restroom restrictions explicitly required covered entities to "designate each multi-occupancy restroom … for the exclusive use by either females or males" using state definitions of sex before restricting use to only "members of that sex." *E.g.*, Idaho Code Ann. § 67-9802(1), (2); § 67-9801(5), (7), (10); § 73-114(2)(c), (g). Idaho subsequently enacted H.B. 752 without any such provision even though laws that impose criminal penalties require *greater* specificity. *Forbes*, 236 F.3d at 1011.

---

[6] Defendants' counsel made a similar suggestion: "[I]t would be easy, at some point in this process, to prove biological sex because there is DNA testing, for example." 1-SER-28. The Attorney General's office later claimed that counsel never said law enforcement would enforce the law through DNA testing. Becca Savransky, Alex Brizee, How will Idaho enforce new bathroom law? It will be tricky, they say*,* Idaho Statesman (July 24, 2026), https://www.idahostatesman.com/news/politics-government/state-politics/article316522264.html.

Additionally, as the district court found, signage for "men and women" does not necessarily mean an establishment has adopted "biological sex" when labeling its facilities. 1-ER-18. This means that a typical restroom sign does not clearly trigger H.B. 752's restriction. This is especially true for a wide range of businesses and other establishments that opposed H.B. 752, that never previously "designated" restrooms to exclude transgender men or women simply by posting signs that said "men" or "women," and that maintain the same signs after H.B. 752's enactment.

This problem persists whether the sign is judged on its face or with knowledge of the proprietor's intent. Plaintiffs' theory is not, as Defendants claim, that an owner's subjective intent *creates* the ambiguity, but that the law is ambiguous as applied to typical restroom signs. AOB-29. Therefore, dictionary definitions of "designate," which do not foreclose subjective intent, cannot resolve the issue. *See* "Designate," Black's Law Dictionary (12th ed. 2024) ("To choose (someone or something) for a particular job or purpose."). Asking the proprietor is not a fix, as the district court found, given the additional ambiguity regarding whether a proprietor's subjective intent can compensate for the law's vagueness. 1-ER-18-19.

Defendants acknowledge the proper inquiry is one of fair notice, which is "measured by common understanding and practices," rather than one of statutory

construction. AOB-13 (*citing Panther v. Hames*, 991 F.2d 576, 578 (9th Cir. 1993)). Nonetheless, they ignore evidence of status quo restroom use by transgender people and focus on definitions that do not reach the disputed question. They argue, for example, that the word "men" on a restroom door will give an ordinary person adequate notice that the sign excludes transgender men because a dictionary definition of "man" includes the word "male" or because a building code includes the word "sex." AOB-27-28. But restating general and disputed terms does not resolve the ambiguity: that the label "men" does not clearly exclude transgender men in light of a longstanding status quo to the contrary.

Defendants next argue that any restroom sign gives sufficient notice of a state-defined designation because "the two sexes have distinct anatomy requiring separate restrooms." AOB-28. Their premise disregards the status quo, as well as the existence of single-user restrooms, including in everyday homes. Moreover, it would not make H.B. 752 any clearer, as sorting people into restrooms based on sex assigned at birth does so without regard to current anatomy.

Defendants also claim the history of sex-separated restrooms, or the existence of building code references to "public facilities… that designate the sex" of the user, somehow show that every sign referencing men or women is a biological sex designation. *Id.* But that does not align with the status quo. Evidence demonstrates that transgender people—under threat of significant

harm—are *not* expected to use a restroom according to "biological sex" where they otherwise do not appear to belong. *See* 2-SER-491 (individuals face increased risk of harassment and assault in public restrooms when they are perceived as not conforming to expected gender norms).

Finally, Defendants fault the preliminary injunction for tracking the statute's language to *prevent* its enforcement. AOB-31. This is not evidence that the statutory language is sufficiently clear for due process purposes. To the contrary, it merely reflects that the injunction is intended to cover the scope of the law. A court need not re-write a vague law before enjoining its enforcement.

### B. This Court need not reach Plaintiffs' remaining constitutional claims and can remand to the district court.

This Court need not reach Plaintiffs' equal protection and informational privacy claims. 1-ER-11. The district court reserved decision on these claims, and when a district court has "explicitly declined to address" a party's "remaining alternative arguments," this Court may "leave those issues for the district court on remand." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1130 (9th Cir. 2024). Though they retain discretion to do so, as a general rule, appellate courts do "not decide issues that the trial court did not decide." *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1110-12 (9th Cir. 2020). Accordingly, the "standard practice" is to "remand to the district court…without requiring any special justification for doing so." *Roth v.*

*Foris Ventures, LLC*, 86 F.4th 832, 838 (9th Cir. 2023) (cleaned up). Thus, remand is appropriate here if it becomes necessary to analyze Plaintiffs' remaining claims.

Nonetheless, if this Court exercises its discretion to consider these claims, Plaintiffs have demonstrated a likelihood of success on the merits of their equal protection and informational privacy claims.

### C. Plaintiffs are likely to succeed on the merits of their Equal Protection Clause claim.

Laws like H.B. 752 that discriminate based on sex or transgender status trigger heightened scrutiny, which requires the government to show "the discriminatory means employed are substantially related to the achievement" of "important governmental objectives." *Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025) (cleaned up).

#### 1. Heightened scrutiny applies to H.B. 752 as a sex- and transgender status-based classification.

Under this Court's reasoning in *Roe*, H.B. 752 triggers heightened scrutiny because it discriminates based on sex and transgender status. *Roe*, 137 F.4th at 922.

***Sex.*** *Roe* recognized that laws restricting restroom access using a particular definition of sex, like H.B. 752, trigger heightened scrutiny as sex classifications. *Roe*, 137 F.4th at 922-23. Defendants agree. AOB-34. Every court of appeals to consider similar rules has agreed and applied heightened scrutiny. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020); *A.C. v. Metro. Sch.*

*Dist. of Martinsville*, 75 F.4th 760, 772 (7th Cir. 2023); *Adams ex rel. Kasper v. Sch. Bd. of St. John's County*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc).

***Transgender status.*** Given Defendants' agreement that heightened scrutiny applies, this Court need not decide whether H.B. 752 also classifies based on transgender status. Nonetheless, H.B. 752 discriminates based on transgender status because it "only changed the status quo for transgender" people who alone are prevented from using restrooms aligned with their gender identity, *Roe*, 137 F.4th at 922, and triggers heightened scrutiny on that basis, *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019).

The Supreme Court's decisions in *West Virginia v. B.P.J. by Jackson*, 146 S. Ct. 2356 (2026), and *United States v. Skrmetti*, 605 U.S. 495 (2025), do not abrogate *Roe*'s holding that laws like H.B. 752 discriminate based on transgender status and trigger heightened scrutiny for that reason.[7] In this Court, a panel decision is binding unless "intervening higher authority" is "clearly irreconcilable." *In re Amy*, 714 F.3d 1165, 1168 (9th Cir. 2013). That "high standard" is not met here. *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013); *see Doe #1 by Doe #2 v. Mukwonago Area Sch. Dist.*, No. 23-cv-876, 2026 WL 2640979 (E.D. Wisc. Sept. 8, 2026) (finding neither *B.P.J.* nor

[7] Defendants do not challenge *Roe*'s application to sex-based classifications based on intervening authority. AOB-39-40.

*Skrmetti* overrules Seventh Circuit cases addressing equal protection challenges to similar restroom restrictions).

First, the Supreme Court in *B.P.J.* emphasized that its analysis was limited to the "distinctive[] sports context." 146 S. Ct. at 2377; *see also, e.g., id*. at 2372, 2376, 2378, 2391 (discussing importance of "sports context"). *B.P.J.*'s holding and its reasoning regarding the "distinctive sports context" are not irreconcilable with Roe's materially different public restroom context.

Second, *Roe* explained that laws like H.B. 752 discriminate based on transgender status because they bar only and all "transgender [people] from using facilities that align with their gender identity." 137 F.4th at 923. *B.P.J.* distinguishes such "distinct transgender classification(s)" from a rule barring only transgender women and girls from girls' sports. 146 S. Ct. at 2378-79. Unlike this latter rule, the rules in *Roe* (and under H.B. 752) sweep far more broadly—restricting *all* transgender people from restrooms aligned with their gender identity.

Finally, nothing in *Skrmetti* abrogates *Roe* because *Skrmetti* addressed the unique context of medical treatment and concluded that a ban on gender-affirming medical treatments did not discriminate based on "transgender status but rather remove[d] one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." *Skrmetti*, 605 U.S. at 518–19. That reasoning has no bearing on a categorical exclusion of transgender

people from public restrooms and is easily reconcilable with *Roe*.

### 2. **<u>Plaintiffs' claim for narrow injunctive relief is proper.</u>**

Plaintiffs challenge H.B. 752 *as applied* to restrooms and seek emergency relief on behalf of transgender individuals in narrow circumstances to prevent the most egregious harms to the class. Defendants assert that under *B.P.J.* the "right question" for heightened scrutiny is "whether requiring people to comply with sex-segregated restrooms advances safety 'as a general matter,'" not only when excluding transgender people. AOB-38. That argument extends *B.P.J.*'s analysis far beyond the sports context into that of public restrooms, which is wrong. But even if that limitation applied here, H.B. 752's restroom prohibition fails heightened scrutiny.

The Court in *B.P.J.* rejected the "as-applied" framework as "particularly out of place in *this* sports case" and "in the sports context" generally, where "an enormous practical and administrability problem would arise" if courts must provide "individualized exemptions." 146 S. Ct. at 2378 (emphasis added). Outside of the unique, zero-sum context of school sports where physiological characteristics may be relevant and some individual, sex-based harms are permissible, courts may properly evaluate sex-based rules as applied.

Regardless of *B.P.J.*'s as-applied equal protection framework, transgender people in Idaho who need to use restrooms represent "an especially large

subclass," 146 S. Ct. at 2377, meaning that Plaintiffs can prevail by demonstrating the lack of "fit" between that subclass and the governmental interest without an as-applied claim. So, Defendants' proposed inquiry is still wrong; the question is whether H.B. 752's displacement of the status quo in sex-separated restrooms with a new rule designed to exclude transgender individuals from restrooms substantially advances the interests the government claims. As discussed below, it does not.

Lastly, Plaintiffs' narrow request for preliminary injunctive relief is consistent with the equal protection claim they pled. *See* AOB-32-34. Defendants agree that Plaintiffs may seek narrower relief for a preliminary injunction, but conflate Plaintiffs' *arguments* with their *claim*—making narrower relief impossible to obtain. AOB-34. Arguing for a partial preliminary injunction, Plaintiffs emphasize why specific aspects of the law are both uniquely harmful and instructive for understanding the overall mismatch between the law's purported objectives and its discriminatory means. This does not create "a claim different from the one pled." AOB-32. Defendants' reliance on *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631 (9th Cir. 2015), to say otherwise is misguided because the motion for injunctive relief there was "entirely unrelated" to the claims pled. *Id.* at 637. Here, Plaintiffs pled an as-applied equal protection claim and sought a narrow injunction on that same underlying claim—there is no

dispute the two are related.[8]

**3. Defendants cannot show H.B. 752's restroom restriction is substantially related to safety and privacy interests.**

Heightened scrutiny requires the government to show that a law's "discriminatory means [] are substantially related to the achievement" of "important governmental objectives." *United States v. Virginia*, 518 U.S. 515, 524 (1996). H.B. 752's discriminatory exclusion of transgender people from restrooms that align with their gender identity is not substantially related to Idaho's safety and privacy interests. As the district court observed, "Idaho may protect those interests without infringing upon Plaintiffs' constitutional rights." 1-ER-20.

***Safety***. H.B. 752's targeted exclusion of transgender people is not substantially related to Idaho's asserted goal of preventing "violent crimes against women and [girls] in public restrooms" for several reasons. AOB-38.

First, H.B. 752 "classif[ies] unnecessarily," as testimony from key Idaho law enforcement groups explains, because "more accurate and impartial lines" have already been "drawn." *Sessions*, 582 U.S. at 63 n. 13 (2017). IFOP and ICOPA opposed H.B. 752 as unnecessary to safety in public restrooms because "existing"

[8] Defendants' citation to the "no set of circumstances" standard from *United States v. Salerno*, 481 U.S. 739 (1987), is puzzling as Plaintiffs did not bring a facial equal protection challenge to H.B. 752—that test is irrelevant here. Nonetheless, the law's application to restrooms fails under *Salerno* even if that is the prevailing standard since it imposes a new sex-separation rule that fails heightened scrutiny.

laws "provide[] [the] tools to address inappropriate or disruptive behavior in restrooms." 1-SER-133; *see also* 1-SER-117.[9] In fact, the law enforcement community testified that H.B. 752 would "create more problems rather than solutions." *Id.*; *see also* 1-SER-133, 1-SER-135 (identifying problems).

Defendants fail to explain how upending the status quo to impose a new "biological sex" rule that excludes transgender people from restrooms consistent with their gender identity will protect women and children. There is no evidence that transgender people are more likely to commit crimes than cisgender people. 1-SER-60, 1-SER-64-65. And Defendants' handful of isolated incidents from across the country, which they assert involve transgender people committing crimes against women in public restrooms, do not evidence such propensity. *See* AOB-38 n.7.[10] There is also no evidence that public restrooms are where violent offenses commonly occur. 1-SER-62. In Idaho, strangers commit just one percent of all sexual violence cases, and three-quarters of those occurred inside a residence. 1-SER-64.

---

[9] *See also e.g.*, Idaho Ann. Code § 18-901 (assault); § 18-903 (battery); § 18-924 (sexual battery); § 18-6101 (rape); § 18-4116 (indecent exposure); § 18-7008 (criminal trespass); § 18-6409 (disturbing the peace).

[10] None of these incidents occurred in Idaho, and the perpetrators were prosecuted under existing criminal laws. Defendants reference other evidence, AOB-39, but none shows that transgender people are more likely to commit crimes (including in public restrooms) or that imposing a blanket prohibition on entry relates to criminal activity at all.

Additionally, H.B. 752 is overbroad in scope as to advancing Idaho's asserted interest in the safety of women and girls in women's restrooms. An obvious overreach of H.B. 752 is its extension into single-user restrooms, which are intended for use by a *single individual*—so normal use implicates no safety concerns. Another significant example of its overbreadth is its exclusion of transgender men from men's restrooms, which does not prevent any conduct occurring in a women's restroom. In fact, by forcing transgender people who are perceived as men into women's restrooms, H.B. 752 invites predatory men to exploit the presence of transgender men to access women in those spaces. Any man could enter a women's restroom and when confronted simply say he is transgender. Thus, H.B. 752 causes the same problem Defendants claim to be addressing through the law.

Finally, the law does not promote the safety of transgender men and women in public restrooms. By requiring the use of restrooms not aligned with their gender identity, H.B. 752 puts transgender people at more risk of violence and harassment. 2-SER-488-489; 1-SER-65-66. Transgender people often mitigate this risk by reducing their intake of food or drink to avoid needing the restroom at all, exposing them to further risk of bodily harm. 2-SER-488-489; 2-ER-180; 2-ER-191; 2-ER-196.

***Privacy.*** Defendants have also failed to show that H.B. 752 substantially

advances the government's interest in promoting bodily privacy in restrooms by reducing exposure of a person's unclothed body, especially to members of the opposite sex. AOB-36-38. Importantly, because single-user restrooms are private by design, H.B. 752's potential to advance Idaho's privacy interest relates only to multi-user restrooms (another illustration of the significant mismatch between H.B. 752's sweeping prohibition and the state's purported interest).

Defendants assert that H.B. 752 advances privacy by ensuring that "restrooms are places where no individual *will be forced* to change or undertake private duties" in the presence of the opposite sex. AOB-37-38 (emphasis added). But, as this Court has previously observed, "[c]ommon sense tells us" that a multi-user restroom "is a place where individuals act in a discreet manner to protect their privacy." *Roe*, 137 F.4th at 924 (cleaned up). Individuals with "true privacy concerns" in "communal restrooms" can protect those concerns by "utiliz[ing] a stall." *Id.*; *see also id.* at 926 (recognizing that "installing privacy partitions" like those already in restrooms have a significant effect on privacy of locker rooms).

Attempting to minimize the privacy of bathroom stalls, Defendants raise stall-door gaps and the performance of "personal duties" in communal areas of restrooms. AOB-37. But neither concern justifies H.B. 752's discriminatory means. Stall-door gaps are relevant only if a person violates the common-sense expectation that no one should purposefully look through those gaps and nothing

suggests transgender people are more likely to do so. Regardless, Defendants have other nondiscriminatory options to address those gaps, such as privacy strips that cover side gaps.

Furthermore, Defendants have not shown the *voluntary* performance of "personal duties" in a public restroom implicates the right to bodily privacy. No one is *forced* to use the restroom, let alone its communal areas, for "personal duties" when in public. By contrast, people needing to relieve themselves *must* do so in a restroom. A justification requiring a presumption of irregularity as to basic public restroom norms or an unsupported, amorphous categorization of the right to bodily privacy in "personal duties" is too speculative and uncertain to meet the demands of heightened scrutiny. *See Virginia*, 518 U.S. at 533 (noting justifications must be "genuine" and "not hypothesized" or reliant on "overbroad generalizations"); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1226 (9th Cir. 2020) (finding transgender person's ordinary restroom use did not implicate plausible privacy right of others in the restroom).

#### 4. **<u>H.B. 752 was motivated by animus.</u>**

H.B. 752 cannot survive any level of scrutiny because it was motivated by animus and disapproval of transgender people, which may be "inferred from the totality of the relevant facts" in this case. *Washington v. Davis*, 426 U.S. 229, 242 (1976). Viewed together, the facts show that Idaho imposed a criminally

punishable "biological sex" rule "because of, not merely in spite of, its adverse effects upon" transgender people. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (cleaned up).

H.B. 752's extensive reach into nearly every public space, including single-stall restrooms, and its harsh criminal penalties are "so far removed from [Idaho's] particular justifications" that it is "impossible to credit them" as anything other than a pretext for animus. *Romer v. Evans*, 517 U.S. 620, 635 (1996). The law covers not only government-owned buildings but also private commercial establishments where an "almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society" take place. *Id.* at 631. The criminal penalties are significantly disproportionate considering H.B. 752 does not require any misconduct or intent to commit harm. And the law was passed notwithstanding a near consensus among testifying law enforcement organizations that the law was unnecessary for public safety.

Evidence from the legislative process *confirms* that disapproval motivated H.B. 752's targeting of transgender people. Legislators referred to transgender people as presumptively criminal, used harmful and inaccurate stereotypes, and some even speculated that they would commit violence if their family members encountered a transgender person in a sex-designated space. 2-ER-224; *see also* 1-SER-105-121. One legislator referred to transgender people as "a myth" because

"there is only male and female." 1-SER-114. Such "den[ials of] the very existence of transgender people" and "seek[ing] to erase them" evince "a bare desire to harm a politically unpopular group." *Washington v. Trump*, 768 F. Supp. 3d 1239, 1250 (W.D. Wash. 2025) (cleaned up); *see PFLAG, Inc. v. Trump*, 769 F. Supp 3d 405, 444 (D. Md. 2025) (observing one "cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the [targeted] group…does not exist").

### D. Plaintiffs are likely to succeed on the merits of their informational privacy claim.

Plaintiffs' claim that H.B. 752 violates their right to informational privacy protected by the Fourteenth Amendment is likely to succeed.

#### 1. <u>The informational privacy right extends to a person's transgender status.</u>

This Court has "recognized a right to informational privacy…stemming from an individual's interest in avoiding disclosure of personal matters." *Doe v. Bonta*, 101 F.4th 633, 637 (9th Cir. 2024); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 553 (9th Cir. 2004), *overruled on other grounds by Dobbs v. Jackson Women's Health Center Org.*, 597 U.S. 215 (2022). Contrary to Defendants' characterization of the right as "dubious," AOB-42, this Court has confirmed that it is "firmly established." *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999). The right prohibits compelled disclosure of sensitive personal matters where the

disclosure may: (1) invite stigma or embarrassment, *In re Crawford*, 194 F.3d at 960; (2) invite bodily harm, *Kallstrom v. Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998); or (3) reveal intimate personal details, such as information implicating one's sexual, medical, or mental health, including one's transgender status. *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) (recognizing a privacy right in confidentiality of one's transgender identity); *United States v. Kravetz*, 706 F.3d 47, 63 (1st Cir. 2013) (medical and mental health); *Livsey v. Salt Lake Cnty*., 275 F.3d 952, 956 (10th Cir. 2001) (sexual and medical health).

The right to protect information that falls under these criteria from government-compelled disclosure is firmly rooted in history and tradition. *See, e.g., Olmstead v. United States*, 277 U.S. 438, 478 (1928) (the Founders "conferred, as against the Government, the right to be let alone—the most comprehensive of rights, and the right most valued by civilized men.") (J. Brandeis, concurring). However, in assessing whether the right protects specific information, this Court considers whether the information is inherently sensitive or intimate, *Crawford*, 194 F.3d at 960, not, as Defendants argue, whether the information at issue was understood or known at the Founding or when the Fourteenth Amendment was ratified. Otherwise, information such as one's HIV status, genetic code, and other personal health data would be unprotected from compelled disclosure. And the right to privacy would inevitably erode as medical

knowledge advances.

Compelled disclosure of a person's transgender status is stigmatizing, invites potential bodily harm, and reveals intimate personal details about one's medical and mental health. Accordingly, many courts have held that a policy requiring transgender individuals to disclose their transgender status infringes their informational privacy right. *See, e.g., Powell*, 175 F.3d at 111 (noting "private and intimate" nature of transgender status is "really beyond debate"); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) (holding informational privacy right violated because denying sex marker changes on driver's licenses "forces [transgender people] to disclose their transgender status"); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015) (observing denial of accurate sex marker implicates privacy right as "very real threat to Plaintiffs' personal security and bodily integrity" (cleaned up)); *Ray v. McCloud*, 507 F. Supp. 3d 925, 931-32 (S.D. Ohio 2020) (observing "forced disclosure" of transgender status creates "risk of bodily harm" and is "highly personal" information protected by "right to informational privacy"). This Court should rule no differently.

**2. H.B. 752 infringes the right to informational privacy by forcing disclosure of transgender status.**

Complying with H.B. 752 compels disclosure of a person's transgender status and thus violates the Plaintiffs' right to informational privacy. Plaintiffs and

other transgender people express their gender identity like everyone else—through their "clothing, name, pronouns, hairstyle as well as using sex separated facilities consistent with their gender identity," 2-SER-485—and are consistently perceived by others consistent with their gender identity. 2-ER-180, 2-ER-185, 2-ER-190, 2-ER-196, 2-ER-201, 2-ER-206. As a result, people who observe Plaintiffs entering a public restroom designated for their sex assigned at birth will either (a) discern Plaintiffs' transgender status based on their compliance with H.B. 752, 2-SER-490, or (b) assume that Plaintiffs are violating the law, which, if the onlooker initiates a confrontation or calls law enforcement, would also require disclosure of their transgender status to establish their compliance with the law. Disclosure of transgender status is inescapable for transgender people under H.B. 752 as restroom use is not optional for anyone needing to relieve themselves in public.[11]

H.B. 752 also forces Plaintiffs to disclose their transgender status while physically present in the confined space of a public restroom, which exposes them to a substantial risk of bodily harm "strip[ping] [Plaintiffs of their] very essence of personhood." *Kallstrom,* 136 F.3d at 1064. The evidence of this risk is undisputed. 2-SER-489-90; *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1137 (D. Idaho 2018)

---

[11] The necessity of restroom use easily distinguishes this case from *Gore v. Lee*, 107 F.4th 548, 563 (6th Cir. 2024) (noting the lack of necessity for a birth certificate to "obtain public benefits or employment").

(transgender people who present mismatched identification are verbally harassed, physically assaulted, and denied service or benefits).

For the same reasons previously explained, *supra* I.C, Defendants cannot show that safety and privacy interests justify H.B. 752's forced disclosure of transgender status. Additionally, H.B. 752 lacks any "safeguards to prevent unauthorized disclosure" of transgender status. *Roe v. Sherry*, 91 F.3d 1270, 1274 (9th Cir. 1996); *see also Gore,* 107 F.4th at 563 (finding safeguard because "law in truth generally prohibits" government "officials from disclosing information contained in a birth certificate").

Defendants disagree that H.B. 752 compels disclosure of Plaintiffs' transgender status because it "allows onlookers to reasonably predict only an individual's sex" and not their gender identity as "Plaintiffs allege" it is "a person's *internal* sense of oneself." AOB-42-43 (emphasis in original). This is nonsense. *See Dep't of Comm. v. New York*, 588 U.S. 752, 785 (2019) (Judges are "not required to exhibit a naiveté from which ordinary citizens are free."). Transgender people, by definition, have a gender identity that differs from their sex assigned at birth. It is that mismatch that becomes known to onlookers given that people's outward expression of their gender identity is perceived in nearly every public encounter. By forcing transgender people into spaces based on their sex assigned at birth—in other words, their genitals at birth—the law is tantamount to placing a

sign above their heads as they enter restrooms announcing that they have a sex at birth that does not match how they live and look.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVORED AN INJUNCTION.

### A. The district court correctly ruled that Plaintiffs will suffer irreparable harm.

The district court correctly held that Plaintiffs will likely suffer irreparable harm if H.B. 752 is not enjoined. 1-ER-19-20. As the district court explained: "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" 1-ER-19 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). Because it is unconstitutionally vague, H.B. 752 deprives Plaintiffs of due process.

H.B. 752 will also irreparably harm Plaintiffs by inflicting "emotional stress, depression, and a reduced sense of well-being." *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 709 (9th Cir. 1988). Forcing Plaintiffs to use sex-separated restrooms that do not align with their gender identity contradicts accepted standards of medical care for transgender individuals and will increase their levels of gender dysphoria, harming their mental health. 2-SER-488, 492; 2-ER-180, 2-ER-185, 2-ER-190, 2-ER-196, 2-ER-201, 2-ER-206. When transgender people are barred from the restrooms that align with their gender identity, many will restrict food and drink intake to avoid using restrooms altogether, increasing

the risk of discomfort, pain, and medical issues. 2-SER-488-89. The possibility of criminal conviction and incarceration under H.B. 752 further intensifies transgender individuals' stress and anxiety.

Additionally, H.B. 752 will force Plaintiffs into vulnerable positions potentially exposing them to violence or harassment. Transgender individuals "are disproportionately subjected to mistreatment in public settings, including verbal harassment and physical assault." 2-SER-490-91. For transgender individuals, including Plaintiffs, complying with H.B. 752 can itself create a risk of physical harm or mistreatment because onlookers may perceive the individual as violating the law and seek to "correct" them.

H.B. 752 will also strip Plaintiffs of the autonomy to decide whether to disclose their gender identity to strangers in public restrooms. 2-SER-490-91. This will inflict further irreparable harm, since the disclosure of one's transgender status, particularly where one would otherwise keep that information private, can provoke intense "hostility and intolerance from others," *Powell*, 175 F.3d at 111, including verbal harassment and physical assault.

### B. The district court correctly ruled that the balance of hardships and the public interest favor an injunction.

As the district court correctly held, the "balance of equities and public interest favor the imposition of a preliminary injunction" in this case. 1-ER-22. In analyzing whether Plaintiffs' "burdens or hardships" weigh more heavily than

Defendants', the "public interest mostly concerns the injunction's impact on nonparties rather than parties." 1-ER-19 (quoting *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021)) (cleaned up).

The district court concluded that the balancing in this case favored an injunction for several reasons. First, Plaintiffs' injury to their constitutional right to due process is an irreparable harm in part because it "cannot be adequately remedied through damages." 1-ER-20 (quoting *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009)) (cleaned up). Although recognizing that "the public has an interest in having duly-enacted laws enforced," the court found that "it is always in the public interest to prevent the violation of a party's constitutional rights." 1-ER-20 (quoting *Melendres*, 695 F.3d at 1002) (cleaned up).

Additionally, Defendants' asserted interests in bodily privacy and protecting women and children in public restrooms do not outweigh the harm to Plaintiffs' constitutional rights or the threat that H.B. 752 poses to their health and safety. The privacy interest fails to outweigh these harms because "protect[ing]" Idaho's "interest[s] in promoting bodily privacy" is possible "without infringing upon Plaintiffs' constitutional rights." 1-ER-20; *see also supra* I.C (explaining flaws in privacy interest). The court found this true for safety because "any actual safety concerns posed by a person entering a restroom 'designated for the opposite

biological sex' are addressed by Idaho's existing laws." 1-ER-20-21 (cleaned up). Furthermore, H.B. 752 permits the same conduct Idaho allegedly sought to prevent: allowing predatory men to easily enter women's restrooms because they can "pose" as transgender. Defendants had also "not presently convinced" the court "that H.B. 752 furthers Idaho's safety interest." 1-ER-21; *see also supra* I.C (explaining flaws in safety interest).

Defendants fault the district court as requiring a "magic number of crimes that must occur in Idaho before Idaho can enact laws that would prevent life-altering incidents." AOB-47. But that twists the court's point, which is that "one incident from over ten years ago" does not *demonstrate* that H.B. 752 accomplishes its safety goal, *i.e.*, *how* it would prevent those incidents. Defendants cannot explain how a person (regardless of gender identity) with a "long history of committing sex crimes" who committed some in a "women's shelter" suddenly will stop at the *restroom* door because H.B. 752 means they risk additional criminal penalties for that nonviolent conduct. *Predator Who Claimed to be Transgender Declared Dangerous Offender,* Toronto Sun (Feb. 26, 2014) (cited by Defendants at AOB-47).

## III. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS HAVE STANDING ON BEHALF OF THE CLASS TO SUE ALL COUNTY PROSECUTOR DEFENDANTS.

The district court correctly determined that Plaintiffs have standing to seek a

preliminary injunction against all 44 County Prosecutors Defendants. 1-ER-10. Defendants concede that Plaintiffs have standing to pursue their claims against the County Prosecutors where they live and work based on threatened enforcement of H.B. 752. AOB-48. They also do not challenge Plaintiffs' injury-in-fact—threat of H.B. 752's enforcement. AOB-48. But as to the remaining County Prosecutors, they argue that Plaintiffs have not demonstrated "traceability" and "redressability" because they do not face that threat from the remaining prosecutors. AOB-48.

The district court correctly rejected this argument. 1-ER-9-10. First, the court explained "[t]hat even one named Plaintiff 'may travel outside their county of residence provides a causal link to the other counties in Idaho.'" 1-ER-9. Here, Plaintiff Daniel Doe has expressly stated that he travels in Idaho "for work and fun." 2-ER-184.

Additionally, the court agreed that Plaintiffs satisfied standing requirements because they represent a class spread across the state. 1-ER-10. "Once a class is properly certified," a court should assess standing requirements "with reference to the class as a whole, not simply with reference to the individual named plaintiffs." *Payton v. Cnty. of Kane*, 308 F.3d 673, 680 (7th Cir. 2002). Class certification "changes the standing aspects of a suit, because '[a] properly certified class has a legal status separate from and independent of the interest asserted by the named plaintiff.'" *Id.* at 680 (quoting *Whitlock v. Johnson*, 153 F.3d 380, 384 (7th Cir.

1998)).

Plaintiffs share claims identical to those of absent class members. As class representatives, Plaintiffs are "personally injured by the operation of the very same statute that caused the injuries to all other members of the proposed class." *Id.* at 682.

Class representatives also have standing to sue, as here, where the harms to absent class members result from defendants who are "juridically linked," including because "the defendants were officials of a single state and its subordinate units of government[.]" *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 469-70 (9th Cir. 1973) (discussing class actions finding concerted scheme by juridically linked defendants); *see also Martinez v. Newsom*, 46 F.4th 965, 971-72 (9th Cir. 2022) (finding no common rule applied to establish juridical link); *Easter v. Am. W. Fin.*, 381 F.3d 948, 962 (9th Cir. 2004) (discussing absence of standing-conferring juridical link among defendants).

This Court has previously recognized the use of the juridical-link doctrine in class action standing cases. In *La Mar*, the Ninth Circuit evaluated two consolidated Rule 23(b)(3) putative class action cases for monetary relief. *La Mar*, 489 F.2d at 462-63, 467. In each case, the named plaintiff was injured by one of the many defendant businesses but alleged that the other defendant businesses operated in the same or similar manner to injure absent class members. *Id.* at 462-

63. This Court presumed without deciding that plaintiffs had standing because in each case, "plaintiff was injured by a method of dealing more or less common to all defendants." *Id.* at 464. However, the Court found that the class representatives could not satisfy Rule 23 typicality and adequacy requirements because they were not injured by some of the defendant businesses that had allegedly injured the absent class members. *Id.* at 465-66. Significantly, the Court noted this position did *not* apply to "instances in which all defendants are juridically related in a manner [suggesting] a single resolution of the dispute would be expeditious." *Id.* at 466. Further explaining this distinction, this Court highlighted cases involving civil rights class actions and the presence of a "legal relationship" between the defendants to establish standing. *Id.* at 469-70 (discussing cases).

*Martinez* leaves open the exact situation established in *La Mar*: that a properly certified class may maintain an action against a group of defendants who are juridically related because they are "officials of a single state and its subordinate units of government" applying a "common rule." *See Martinez*, 46 F.4th at 971; *La Mar*, 489 F.2d at 470. In *Martinez*, the juridical link doctrine was not applicable because defendant school districts were encouraged to develop their own plans and that there was therefore no "common rule" which every district was required to follow. 46 F.4th at 971. Without a "common rule" there was no juridical link between the districts. *Id.* at 971-72.

Because the County Prosecutors are "officials of a single state and its subordinate units of government" charged with enforcing the same law across Idaho, Plaintiffs have established standing. *See La Mar*, 489 F.2d at 470; *see also* Idaho Code Ann. §§ 31-227, 31-2604(1) (detailing duties of County Prosecutors in enforcing Idaho law).

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN PROVISIONALLY GRANTING CLASS CERTIFICATION.

The district court did not abuse its discretion by granting provisional class certification for purposes of entering preliminary injunctive relief based on due process violations that expose all class members to an unnecessary risk of harm. *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020).

### A. The district court did not err in defining the class.

The district court properly defined the class as "all transgender people who seek to use a restroom in a government-owned building or place of public accommodation in Idaho consistent with their gender identity." 1-ER-30. Defendants fault this definition as insufficiently definite because class membership is "unknowable and unverifiable." AOB-50-51. But they cite cases regarding heightened standards for classes certified under Rule 23(b)(3) for seeking monetary damages, referred to as ascertainability. *See* AOB-50-51 (*citing*, *e.g., Mullins v. Direct Digit., LLC*, 795 F.3d 654, 660 (7th Cir. 2015) (discussing ascertainability); *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th

Cir. 1978) (regarding a Rule 23(b)(3) class action)).

Requirements of definiteness or ascertainability are generally not applied to Rule 23(b)(2) classes "where a party is charged with discriminating unlawfully against a class, *usually one whose members are incapable of specific enumeration*." Fed. R. Civ. P. 23 advisory committee's note (1966) (emphasis in original); *see also Kadel v. Folwell*, 100 F.4th 122, 160-61 (4th Cir. 2024), *judgment vacated on other grounds*, 145 S. Ct. 2838 (2025) (noting that "courts of appeals have consistently declined to impose an ascertainability requirement in 23(b)(2) cases requesting" injunctive relief); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017) (rejecting administratively feasible identification requirement even in context of 23(b)(3) class actions); *Shelton v. Bledsoe*, 775 F.3d 554, 562 (3d Cir. 2015) (rejecting ascertainability for a (b)(2) class); *see also Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972) (rejecting administrative feasibility requirement in 23(b)(2) class action); *Doe #1 v. Trump*, 335 F.R.D. 416, 436 (D. Or. 2020) (finding that "[t]o the extent *any* aspect of ascertainability remains in this circuit after *Briseno*," it would not apply to a Rule 23(b)(2) class) (emphasis added).

Whether Defendants intend to challenge ascertainability or another baseless "definiteness" requirement, the class definition here is sufficient for a Rule 23(b)(2) class action. The class definition includes transgender people who will be

barred from accessing restrooms aligned with their gender by operation of H.B. 752. This is far more specific than even the Rule 23(b)(2) class definition approved in *Probe v. State Teachers' Ret. Sys.*, which "seem[ed] to include every male person in the world." 780 F.2d 776, 780 (9th Cir. 1986).

### B. The district court did not err in finding the class satisfied Rule 23(a)'s commonality requirement.

The district court did not err in finding Plaintiffs satisfied Rule 23(a) commonality, which requires that proceeding as a class can "generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (cleaned up). Plaintiffs need not show that "every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (quotation omitted).

As the district court explained, the class satisfies commonality because all members "suffer[] exactly the same constitutional injury" from "expos[ure] to a single statewide policy." 1-ER-25. Plaintiffs share common facts with the class as all are transgender individuals who will be barred from using restrooms that align with their gender identity under H.B. 752. These factual commonalities advance resolution of the "common contention" in "whether H.B. 752 is unconstitutionally vague because it fails to provide fair notice about what conduct is prohibited and

invites arbitrary and discriminatory enforcement." 1-ER-25. Additional common legal questions capable of class-wide resolution arise from Plaintiffs' other constitutional claims.

Defendants dispute commonality because transgender people are diverse in age, have differing experiences of social and medical transition, and can describe their gender identity using a variety of terms. AOB-51-52. But as the district court found, "Plaintiffs need not show that every class member shares the same attributes or suffered the same injury." 1-ER-24-25. These differences do not affect the commonality analysis in this case, which centers on "the elements of the class [members'] case-in-chief." *See Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1114 (9th Cir. 2014) (*quoting Wal-Mart*, 564 U.S. at 350)). Neither age nor medical transition affect the common legal contention identified by the district court (or those arising from Plaintiffs' other claims).

Finally, Defendants argue that because only "*some*" transgender people "look[ ] indistinguishable" from cisgender people of their gender, the class is not common for purposes of determining whether the law enables arbitrary enforcement. AOB-52. But whether H.B. 752 invites arbitrary enforcement analyzes the statute as a matter of common understanding and common practices regardless of a person's gender identity.

## CONCLUSION

For the reasons stated herein, this Court should affirm the district court's order granting Plaintiffs' request for a preliminary injunction.

Dated: October 9, 2026

Respectfully submitted,

/s/ *J. Max Rosen*

J. Max Rosen
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105
(415) 512-4000

Katherine M. Forster
Eduardo A. González
Kyle A. Groves
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071
(213) 683-9100

Peter C. Renn
Kell L. Olson†
Tara L. Borelli†
Pelecanos†
A.D. Sean Lewis
Charlie Ferguson†
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†*mailing address only*
(213) 382-7600

Emily Croston
Paul Southwick
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
(208) 344-9750

Barbara Schwabauer
Eleanor Matheson
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street N.W.
Washington, DC 20005
(212) 549-2500

Chase Strangio
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor New York, NY 10004
(212) 549-2500

Samuel L. Linnet
ALTURAS LAW GROUP, PLLC
111 N. 1st Ave., Suite 2I
PO Box 2975
Hailey, ID 83333
(208) 788-6688

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief complies with the limitation of Circuit Rule 32-1 because it contains 13,703 words. This Brief complies with the typeface and the type style requirements of Fed. R. App. P. 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

/s/ *J. Max Rosen*
J. Max Rosen

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate ACMS, and that service will be accomplished by the appellate ACMS system on all registered participants.

/s/ *J. Max Rosen*
J. Max Rosen