No. 26-4551

# United States Court of Appeals for the Ninth Circuit

EMILIE JACKSON-EDNEY, et al.,

*Plaintiffs–Appellees*,

*v.*

RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al.,

*Defendants–Appellants*.

Appeal from the United States District Court for the District of Idaho, No. 1:26-cv-00261-AKB

## BRIEF OF *AMICUS CURIAE* HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC IN SUPPORT OF PLAINTIFFS-APPELLEES

Kristen Clarke
Dariely Rodriguez
HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC
2900 Van Ness Street, N.W.
Washington, DC 20008
(202) 806-8082
kristen.clarke@howard.edu

Tyler J. Domino
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
tdomino@sidley.com

Jacob Steinberg-Otter
Michael Loedel
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
jacob.steinbergotter@sidley.com
michael.loedel@sidley.com

*Counsel for* Amicus Curiae

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTEREST OF *AMICUS CURIAE* ........ 1

SUMMARY OF ARGUMENT ........ 2

ARGUMENT ........ 4

I. Idaho's "restroom law" is part of a broader trend of laws targeting transgender individuals. ........ 4

II. Restroom bills targeting transgender individuals echo racial segregation in public restrooms during Jim Crow. ........ 7

A. Laws restricting access to public restrooms have long been used as instruments of discrimination ........ 7

B. Justifications for restricting access to public restrooms did not withstand scrutiny in the courts. ........ 11

III. Restroom restrictions inflict dignitary harm on transgender individuals and disproportionately harm Black transgender individuals. ........ 13

CONCLUSION ........ 17

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ........ 5

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954) ........ 1, 2

*Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*,
580 U.S. 1168 (2017) ........ 1

*Harper v. Mayor of Balt.*,
359 F. Supp. 1187 (D. Md. 1973) ........ 10

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
584 U.S. 617 (2018) ........ 3

*Papachristou v. City of Jacksonville*,
405 U.S. 156 (1972) ........ 16

*Regents of the Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978) ........ 9

*Turner v. Randolph*,
195 F. Supp. 677 (W.D. Tenn. 1961) ........ 12

### Statutes

Act of Feb. 12, 1915, 1915 S.C. Acts 79, 79 ........ 8

Ala. Code § 26-26-4 (2022) ........ 6

Idaho Code § 18-4117(1) ........ 7

Idaho Code § 67-5902(9) ........ 7

2016 N.C. Sess. Laws 12–13 ........ 4

2017 N.C. Sess. Laws 81 ........ 4

**Other Authorities**

Bagagli, Beatriz Pagliarini, Tyara Veriato Chaves & Mónica G. Zoppi Fontana, *Trans Women and Public Restrooms: The Legal Discourse and Its Violence,* 6 Frontiers in Socio. 1 (2021)........................................................................................ 14

Cal. Task Force to Study & Dev. Reparation Proposals for Afr. Ams., *The California Reparations Report* (2023), https://shorturl.at/78ykb........................................................................ 8

DeChants, Jonah P., *Transgender and Nonbinary Young People's Bathroom Avoidance and Mental Health,* 26 Int'l J. Transgender Health 351 (2021)................................................... 13

Ezie, Chinyere & Richard Saenz, *Abuse and Neglect of Transgender People in Prisons and Jails: A Lawyer's Perspective*, Lambda Legal (Nov. 25, 2020), https://shorturl.at/6gzDf ...................................................................... 15

Fredericksen, Erik, *Protecting Transgender Youth After* Bostock*: Sex Classification, Sex Stereotypes, and the Future of Equal Protection*, 132 Yale L.J. 1149 (2023) ........................ 6

Godfrey, Phoebe, *Bayonets, Brainwashing, and Bathrooms: The Discourse of Race, Gender, and Sexuality in the Desegregation of Little Rock's Central High*, 62 Ark. Hist. Q. 42 (2003)........................................................................................ 11

Grant, Jamie M., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* (2011), https://shorturl.at/Z1Pw3 ............................................................ 14, 15

Hum. Rts. Campaign Found., *Fatal Violence Against Transgender and Gender Non-Conforming People in the United States* (2025) https://shorturl.at/U1vlz.................................. 16

James, Sandy E., Carter Brown & Isaiah Wilson, *2015 U.S. Transgender Survey: Report on the Experiences of Black Respondents* (2015), https://shorturl.at/3KJtV .................................. 14

Jim Crow Museum, *Jim Crow Restrooms*, https://shorturl.at/czeBA (last visited Oct. 16, 2026)............................ 9

Kluger, Richard, *Simple Justice: The History of* Brown v. Board of Education *and Black America's Struggle for Equality* (1975)........................................................................ 8

Mathy, Robin M. & Naaz Mirreghabie, *Bathroom Bills and the Policing of Gender: Challenging the Discourse of Exclusion*, J. Soc. Work & Soc. Welfare Pol'y art. 129 (2025), https://shorturl.at/brcCc ........................................................... 5

Movement Advancement Project, *Nondiscrimination/LGBTQ Youth: Bans on Transgender People's Use of Bathrooms & Facilities in Government-Owned Buildings & Spaces* (last updated Sep. 1, 2026) ............................................................... 5

Petrin, Kae, *State Laws Are 'Leveraging Criminalization as a Tactic Against Trans People'*, Truth Dig (May 13, 2026), https://shorturl.at/ySSZR ......................................................... 6

Simon, Bryant, *The Trouble with Bathrooms*, 4 Mod. Amer. Hist. 201 (2021)...................................................................... 10

Spence-Mitchell, Tynslei, *Restroom Restrictions: How Race and Sexuality Have Affected Bathroom Legislation*, 28 Gender, Work & Org. 14 (2021)................................................................ 7

*Tracking the Rise of Anti-Trans Bills in the U.S.*, Trans Legis. Tracker, https://shorturl.at/ABBh8 (last visited Oct. 16, 2026)........................................................................................ 6

U.S. Dep't of Just., C.R. Div., File No. 144-2-1431, Notice to Close File, (Mar. 28, 2011), https://shorturl.at/ybwsC....................... 10

Weinberg, Jill D., *Transgender Bathroom Usage: A Privileging of Biology and Physical Difference in the Law,* 18 Buff. J. Gen. L. & Soc. Pol'y 147 (2009) .......... 3

Wolff, Tobias Barrington, *Civil Rights Reform and the Body*, 6 Harv. L. & Pol'y Rev. 201 (2012) .......... 11

## INTEREST OF *AMICUS CURIAE*[1]

Howard University School of Law is the nation's first historically Black law school. For more than 150 years since its founding during Reconstruction, the law school has worked to train "social engineers" devoted to the pursuit of human rights and racial justice.

As part of its mission, *amicus curiae*, the Howard University School of Law Civil Rights Clinic, advocates on behalf of clients and communities fighting for the recognition of civil rights guaranteed by the Constitution. *See* Brief of *Amicus Curiae* Howard University School of Law Civil Rights Clinic in Support of Respondents, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm,* 580 U.S. 1168 (2017) (No. 16-273) (emphasizing that the school board policy requiring transgender students to use separate, single-sex restrooms evoked the same justifications and harms of racial segregation). The Clinic carries out its work in the tradition of its founder, Charles Hamilton Houston, who helped develop the legal strategy that ultimately led to the Supreme Court's landmark ruling in *Brown v. Board*

[1] No counsel for any party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund its preparation or submission. No person—other than *amicus curiae*, its members, or its counsel—contributed money intended to fund preparing or submitting this brief. Counsel for all parties have consented to the filing of this brief.

*of Education*, 347 U.S. 483 (1954). In *Brown*, the Supreme Court observed that separating students because of their race "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Id.* at 494.

This case raises pressing issues of stigma, separation, and what it means to relegate marginalized people to the injurious consequences of state laws that impose second-class status. The Clinic has a vested interest in ensuring that Black people and people of color, including those who identify as transgender, can live dignified lives free from stigma, discrimination, and harassment. The Clinic is concerned about the parallels that can be drawn between the Idaho law at issue in this case and legislative actions that have historically targeted Black Americans that have been fueled by prejudice and bias.

## SUMMARY OF ARGUMENT

Idaho's House Bill 752 (H.B. 752) contributes to the significant uptick in the passage of state laws prohibiting transgender people from using public restrooms that align with their gender identity. Concerningly, several states—including Idaho—have intensified these "restroom laws" by imposing criminal sanctions for violations.

Such restroom laws harken back to the shameful legal mandates that Southern states imposed during the Jim Crow era, including those requiring racially segregated public restrooms. These segregation laws invoked societal fears related to race, sexuality, and gender to justify legislation meant to maintain strict social hierarchies and marginalize Black people. As Jill Weinberg noted, "although society may view race and gender differences as different cases, the rhetoric of anatomy and power have been employed for both [African Americans and transgender individuals]." Jill D. Weinberg, *Transgender Bathroom Usage: A Privileging of Biology and Physical Difference in the Law*, 18 Buff. J. Gen. L. & Soc. Pol'y 147, 152 (2009).

Transgender individuals should not be "treated as social outcasts or as inferior in dignity and worth." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 631 (2018). Black transgender individuals—in particular—experience severe, disproportionate rates of criminalization, discrimination, and violence that lie at the intersection of their racial and gender identities. Discriminatory restroom laws exacerbate this issue by making Black transgender people targets of police profiling and harassment. A thriving, diverse society in which everyone regardless of

identity feels respected and safe requires that public accommodations, including restrooms, be free from discrimination.

The Clinic, as *amicus*, urges the Court to affirm the district court's ruling preliminarily enjoining the enforcement of H.B. 752 as void for vagueness under the Due Process Clause. The Clinic also agrees with Appellees that H.B. 752 violates the Equal Protection Clause because it discriminates based on sex and transgender status without sufficiently advancing the State's asserted safety and privacy interests and was motivated by discriminatory animus against transgender people.

## ARGUMENT

### I. Idaho's "restroom law" is part of a broader trend of laws targeting transgender individuals.

The recent proliferation of restroom laws targeting transgender individuals can be traced back to North Carolina's Public Facilities Privacy & Security Act from 2016. *See* 2016 N.C. Sess. Laws 12–13. The bill prohibited transgender individuals from using restrooms or changing facilities that aligned with their gender identity. *Id.*

Although the legislation sparked nationwide backlash and was partially repealed in 2017, many states subsequently followed suit. *See* 2017 N.C. Sess. Laws 81; Movement Advancement Project,

*Nondiscrimination/LGBTQ Youth: Bans on Transgender People's Use of Bathrooms & Facilities in Government-Owned Buildings & Spaces* 9–24 (last updated Sep. 1, 2026). At least twenty-one states have since passed laws restricting access to public or government-run restrooms (and in some cases restrooms in K-12 schools or universities) based on sex assigned at birth rather than gender identity. *Id.* Three states in addition to Idaho—Kansas, Florida, and Utah—have enacted laws that impose criminal penalties for individuals who violate these laws. *Id.* at 11–14, 22.

In 2020, the Supreme Court delivered a landmark decision in *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020). The Court held that Title VII of the Civil Rights Act of 1964's prohibition on workplace discrimination "on the basis of … sex" protects against discrimination based on sexual orientation or gender identity. *Id.* at 650–52. Unfortunately, however, numerous state legislatures nonetheless moved to target transgender individuals' ability to access facilities essential to meaningful participation in workplaces and public life. Since 2021, restrictions on transgender individuals' restroom use "accelerat[ed]." Robin M. Mathy & Naaz Mirreghabie, *Bathroom Bills and the Policing of Gender: Challenging the*

*Discourse of Exclusion*, J. Soc. Work & Soc. Welfare Pol'y art. 129 (2025), https://shorturl.at/brcCc; *see also* Erik Fredericksen, *Protecting Transgender Youth After* Bostock*: Sex Classification, Sex Stereotypes, and the Future of Equal Protection*, 132 Yale L.J. 1149, 1152 nn.8–10, 1153 n.11 (2023) (listing cases where courts enjoined state restrictions, including restroom access).

Restroom laws represent just one legislative line of attack against transgender individuals in recent years. State legislators have introduced more than 3,000 bills targeting transgender individuals from 2020 to now. *See Tracking the Rise of Anti-Trans Bills in the U.S.*, Trans Legis. Tracker, https://shorturl.at/ABBh8 (last visited Oct. 16, 2026). At least ten states have enacted laws that impose criminal penalties, targeting transgender individuals themselves or their healthcare providers. *See* Kae Petrin, *State Laws Are 'Leveraging Criminalization as a Tactic Against Trans People'*, Truth Dig (May 13, 2026), https://shorturl.at/ySSZR (listing states that have enacted laws imposing criminal penalties on transgender individuals for various conduct); *see, e.g.*, Ala. Code § 26-26-4 (2022) (criminalizing gender-affirming care as a felony).

Idaho's H.B. 752 is part of this alarming pattern of state laws restricting access to restrooms, with criminal penalties. The law applies to a wide swath of public accommodations, including restaurants, doctor offices, theaters, museums, banks, gas stations, and stores. *See* Idaho Code § 18-4117(1); Idaho Code § 67-5902(9). It also applies to all government-owned buildings, such as courthouses, libraries, city halls, local and state parks, and the State's Capitol Building. *See* Idaho Code § 18-4117(1). And its criminal penalties are severe—a first offense is a misdemeanor punishable by up to one year of imprisonment, and a subsequent offense within five years is a felony punishable by up to five years. *Id.*

## II. Restroom bills targeting transgender individuals echo racial segregation in public restrooms during Jim Crow.

### A. Laws restricting access to public restrooms have long been used as instruments of discrimination.

State laws today governing restrooms used by transgender people echo a long line of racial segregation in public restrooms. *See* Tynslei Spence-Mitchell, *Restroom Restrictions: How Race and Sexuality Have Affected Bathroom Legislation*, 28 Gender, Work & Org. 14, 18 (2021) (arguing that the discrimination undergirding current restroom legislation targeting transgender people is similar to the discrimination that

motivated Jim Crow restroom policies). Laws mandating racially segregated restrooms dating back to the Jim Crow era sought to invoke societal fears related to race, sexuality, and gender as a basis for legislation to demean, marginalize, and subordinate Black people.

From the end of Reconstruction to the passage of the Civil Rights Act of 1964, Southern states enforced strict racial segregation of public restrooms. Under these Jim Crow laws, "[p]ublic washrooms and water fountains were rigidly demarcated to prevent contaminating contact with the same people who cooked the white South's meals, cleaned its houses, and tended its children." Richard Kluger, *Simple Justice: The History of* Brown v. Board of Education *and Black America's Struggle for Equality* 86 (1st Vintage Books ed., Vintage Books 2004) (1975).

Restrictions on public-restroom use during the Jim Crow era were prevalent. For example, in 1915, a South Carolina textile law penalized mills that failed to separate Black and white laborers in their workrooms. Act of Feb. 12, 1915, 1915 S.C. Acts 79, 79; *see also* Cal. Task Force to Study & Dev. Reparation Proposals for Afr. Ams., *The California Reparations Report* 358 (2023), https://shorturl.at/78ykb (explaining that Black textile workers in South Carolina were prohibited from working in

the same rooms or using the same water buckets or glasses as white workers). This discrimination also manifested in federal workplaces. During the 1910s, "the Federal Government began to require segregation in Government buildings," including "separate bathrooms." *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 394 (1978) (Marshall, J., concurring in the judgment).

In addition to segregated restrooms, some Southern workplaces and public facilities imposed these policies on a micro-level, even designating separate toilet paper rolls, soap bars, towels, and washbasins for Black and white people. Racially segregated toilet paper rolls and soap bars served as daily stigmatizing reminders of Jim Crow's rigid racial hierarchy. *See* Jim Crow Museum, *Jim Crow Restrooms*, https://shorturl.at/czeBA (last visited Oct. 16, 2026). This micromanagement of restroom spaces illustrates the perverse consequences of policies that are fueled by discriminatory bias and social anxieties.

The enforcement of racially segregated restrooms also subjected Black Americans to threats, arrest, and even deadly violence. In 1956, after the National Guard left Little Rock, Arkansas, the nine Black students enrolled at Central High School faced "daily confrontations over

access to washrooms." Bryant Simon, *The Trouble with Bathrooms*, 4 Mod. Am. Hist. 201, 201–07 (2021). In 1961, Black Freedom Riders walked into "whites only" bus-station restrooms in Virginia and South Carolina and were immediately arrested. *See id.* And in 1966, Samuel Younge, Jr., a twenty-one-year-old Black U.S. Navy veteran and civil rights activist, was fatally shot by Marvin Segrest, a sixty-eight-year-old white gas station attendant, after an argument over Younge's desire to use a segregated restroom in Tuskegee, Alabama. *See* U.S. Dep't of Just., C.R. Div., File No. 144-2-1431, Notice to Close File (Mar. 28, 2011), https://shorturl.at/ybwsC.

Even after legal segregation formally ended, the harm these laws caused persisted in public life. For example, Black firefighters faced discrimination in the decades after Jim Crow. The job involves day-long shifts that require living, eating, and sharing restroom facilities in the often-intimate confines of the fire station. Following efforts to legally desegregate these workplaces, Black firefighters continued to face resistance from white firefighters who refused to share intimate spaces. *See Harper v. Mayor of Balt.*, 359 F. Supp. 1187, 1194–95 & n.11 (D. Md.

1973), *aff'd in relevant part sub nom. Harper v. Kloster*, 486 F.2d 1134 (4th Cir. 1973).

### B. Justifications for restricting access to public restrooms did not withstand scrutiny in the courts.

Segregationists frequently advanced false rhetoric regarding safety, privacy, and public health—such as the unfounded fear of venereal-disease transmission—to legally bar Black people from using white facilities. *See* Phoebe Godfrey, *Bayonets, Brainwashing, and Bathrooms: The Discourse of Race, Gender, and Sexuality in the Desegregation of Little Rock's Central High*, 62 Ark. Hist. Q. 42, 52, 63–64 (2003). These laws rested on false and unfounded myths of Black sexual deviance and disease, anxieties about which extended to other related areas such as public pools and changing rooms. *See* Tobias Barrington Wolff, *Civil Rights Reform and the Body*, 6 Harv. L. & Pol'y Rev. 201, 217 (2012).

But these purported public-health justifications for restroom segregation did not withstand judicial scrutiny. In 1961, for example, the City of Memphis defended its segregated restrooms in public libraries by arguing that its ordinances were necessary "to avoid the spread of contagious diseases" because (it claimed) venereal disease was so widespread among Black residents that integration would endanger white women.

*Turner v. Randolph*, 195 F. Supp. 677, 680 (W.D. Tenn. 1961). However, the court found insufficient evidence that shared toilets would spread disease. In fact, the same witness for the City testified that "no scientific or reliable data ha[d] been offered to demonstrate that the joint use of toilet facilities by the races … would constitute a … danger to the public health, safety or welfare." *Id.*

Similarly here, the district court was unconvinced of the safety interests underpinning the passage of H.B. 752. Legislators' statements supporting H.B. 752 argued that the law aims to protect safety and privacy and prevent discomfort. As the district court noted, however, there has been "only one incident, from over ten years ago, involv[ing] a transgender person, who was ultimately prosecuted under existing Idaho law." Mem. Decision & Order at 20, Dkt. No. 58. A single incident is simply insufficient "to demonstrate that H.B. 752 materially advances Idaho's asserted interest in protecting restroom users from harm, particularly where the conduct at issue was already prohibited by existing criminal statutes and prosecuted accordingly." *Id.*

## III. Restroom restrictions inflict dignitary harm on transgender individuals and disproportionately harm Black transgender individuals.

This history is playing out again. H.B. 752 and similar restroom restrictions inflict a dual harm: They demean the dignity of transgender people and disproportionately harm Black transgender individuals.

Restroom exclusion imposes costs beyond inconvenience; it forces those who are gender nonconforming to compromise their dignity and health. A 2021 survey of transgender and nonbinary young people found that 49% reported sometimes avoiding public restrooms out of fear and 22% avoided using them completely. *See* Jonah P. DeChants, *Transgender and Nonbinary Young People's Bathroom Avoidance and Mental Health*, 26 Int'l J. Transgender Health 351, 354 (2021). Many went to great lengths to do so: 67% reported not using the restroom when they needed one ("holding it"), while 38% avoided eating or drinking to avoid using public facilities. *Id.* at 355. Individuals who reported avoiding the restroom also had significantly higher odds of adverse mental health indicators, with those who purposefully avoided restrooms being twice as likely to attempt suicide compared to their peers who did not avoid restrooms. *Id* at 356.

The threat of criminal charges for violating H.B. 752 would also compound the disproportionate harassment and overcriminalization that Black transgender individuals—particularly Black transgender women—already face. *See* Beatriz Pagliarini Bagagli, Tyara Veriato Chaves & Mónica G. Zoppi Fontana, *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 Frontiers in Socio. 1, 3–5, 10 (2021). In one survey, 22% reported mistreatment by police, with Black respondents facing much higher rates: 38% reported harassment, 15% reported physical assault, and 7% reported sexual assault. *See* Jamie M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 160 (2011), https://shorturl.at/Z1Pw3; *see also* Sandy E. James, Carter Brown & Isaiah Wilson, *2015 U.S. Transgender Survey: Report on the Experiences of Black Respondents* 16 tbl. 8 (2017), https://shorturl.at/AM9rA (reporting that, among Black respondents who interacted with officers who knew or believed they were transgender in the preceding year, 22% reported verbal harassment, 12% physical attacks, and 6% sexual assault). About 41% of Black transgender and gender-nonconforming individuals

reported being arrested or detained because of their gender identity or expression. *See* Grant et al., *supra*, at 163.

These problems do not occur in isolation, but against a backdrop of substantial economic and social disadvantage that Black transgender and gender-nonconforming individuals face. Twenty percent report being unemployed, 42% report experiencing homelessness, 38% report living in poverty, and less than 40% report having earned anything over a bachelor's degree. *See* James, Brown & Wilson, *supra*, at 3, 5. And nearly 47% of Black transgender and gender-nonconforming people have experienced incarceration in their lifetime, compared to roughly 21% of all transgender women. *See* Chinyere Ezie & Richard Saenz, *Abuse and Neglect of Transgender People in Prisons and Jails: A Lawyer's Perspective*, Lambda Legal (Nov. 25, 2020), https://shorturl.at/6gzDf.

For Black transgender individuals, moreover, the consequences of incarceration can be especially severe. They are frequently housed improperly based on their sex assigned at birth, placed in solitary confinement, and denied necessary medical or gender-affirming care while facing high risks of physical and sexual assault. *See* James, Brown & Wilson, *supra*, at 17 ("In the past year, 40% were physically assaulted by

*staff or other inmates*, nearly twice the rate in the USTS sample overall (23%).”). And the risks of violence they face extend beyond prison walls: of the 399 known victims of fatal violence against transgender and gender nonconforming individuals since 2013, 70% were Black. *See* Hum. Rts. Campaign Found., *Fatal Violence Against Transgender and Gender Non-Conforming People in the United States* 1, 3 (2025), https://shorturl.at/U1vlz. Nearly 60% of all victims were Black transgender women. *See id.*

Vague laws like H.B. 752 allow law enforcement to arbitrarily identify and categorize those they deem “undesirable” and subject them to the devastating consequences of overenforcement and criminal penalties. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 166–170 (1972). If this Court vacates the district court’s decision, it will compound the harms already faced by transgender individuals, and disproportionately impact Black transgender individuals who face higher rates of discrimination and criminalization.

## CONCLUSION

For the foregoing reasons, we urge this Court to protect the dignity and autonomy of transgender people by affirming the preliminary injunction blocking enforcement of H.B. 752.

October 16, 2026

Respectfully submitted,

*/s/ Kristen Clarke*
Kristen Clarke
Dariely Rodriguez
HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC
2900 Van Ness Street, N.W.
Washington, DC 20008
(202) 806-8082
kristen.clarke@howard.edu

*/s/ Tyler J. Domino*
Tyler J. Domino
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
tdomino@sidley.com

Jacob Steinberg-Otter
Michael Loedel
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
jacob.steinbergotter@sidley.com
michael.loedel@sidley.com

*Counsel for* Amicus Curiae