No. 26-4551

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

JACKSON-EDNEY, et al.,

Plaintiffs-Appellants,

v.

RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al.,

Defendants-Appellees.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT OF IDAHO
No. 1:26-cv-00261-AKB

# BRIEF OF *AMICUS CURIAE* BY THE STATES OF WASHINGTON, NEW YORK, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF APPELLANTS

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
PATRICIO MARQUEZ
*Division Chief*
*Wing Luke Civil Rights Division*
NEAL LUNA
*Assistant Attorney General*
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

LETITIA JAMES
*Attorney General*
*State of New York*
BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
MARK S. GRUBE
*Senior Assistant Solicitor General*
ELIZABETH A. BRODY
*Assistant Solicitor General*
28 Liberty Street
New York, New York 10005
(212) 416-8014

(*Additional counsel listed on signature pages)*

Dated: October 16, 2026

INTERESTS OF THE AMICI STATES .................................................... 1

ARGUMENT ........................................................................................ 3

I. PROTECTING TRANSGENDER PEOPLE FROM DISCRIMINATION CONFERS WIDE SOCIETAL BENEFITS WITHOUT COMPROMISING THE PRIVACY OR SAFETY OF OTHERS .............................. 3

A. Transgender People Face Pervasive and Harmful Discrimination That Causes Them Serious Harms. ................ 6

B. The Amici States' Experiences Confirm That Protecting Transgender People from Discrimination in Restroom Access Yields Broad Benefits Without Compromising Privacy or Safety. ............................................................. 14

1. Nondiscriminatory restroom policies pose no safety concerns, but discriminatory restroom policies, like Idaho's H.B. 752, do. ........................................................ 17

2. Nondiscriminatory restroom policies neither compromise personal privacy nor require significant expenditures. ................................................................ 22

II. ENFORCEMENT OF IDAHO'S H.B. 752 WOULD VIOLATE THE EQUAL PROTECTION CLAUSE ............................................................ 25

CONCLUSION .................................................................................. 29

INTERESTS OF THE AMICI STATES .................................................. 1

ARGUMENT ......................................................................................... 3

I. PROTECTING TRANSGENDER PEOPLE FROM DISCRIMINATION CONFERS WIDE SOCIETAL BENEFITS WITHOUT COMPROMISING THE PRIVACY OR SAFETY OF OTHERS .............................. 3

A. Transgender People Face Pervasive and Harmful Discrimination That Causes Them Serious Harms. ................ 6

B. The Amici States' Experiences Confirm That Protecting Transgender People from Discrimination in Restroom Access Yields Broad Benefits Without Compromising Privacy or Safety. ............................................................ 14

1. Nondiscriminatory restroom policies pose no safety concerns, but discriminatory restroom policies, like Idaho's H.B. 752, do. ...................................................... 17

2. Nondiscriminatory restroom policies neither compromise personal privacy nor require significant expenditures. ............................................................... 22

II. ENFORCEMENT OF IDAHO'S H.B. 752 WOULD VIOLATE THE EQUAL PROTECTION CLAUSE ............................................................ 25

CONCLUSION .................................................................................. 29

# TABLE OF AUTHORITIES

## Cases

**Page(s)**

*Bostock v. Clayton Cnty.*,
590 U.S. 644, 140 S. Ct. 1731, 207 L. Ed. 2d 218 (2020) ....5

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985) .... 25, 29

*Clark v. Arizona Interscholastic Ass'n*,
695 F.2d 1126 (9th Cir. 1982) .... 25

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020).... 12

*Roberts v.* United States Jaycees,
468 U.S. 609 (1984).... 6, 17

*Roe v. Critchfield*,
137 F.4th 912 (9th Cir. 2025) .... 23, 27

*Romer v. Evans*
517 U.S. 620 (1196) .... 27

*Sexuality & Gender All. v. Critchfield*,
No. 1:23-cv-00315-DCN, 2025 WL 2256884 (D. Idaho Aug. 7, 2025) .... 19

*West Virginia v. B. P. J.*,
146 S. Ct. 2356 (2026).... 29

## Laws

**Page(s)**

*California*

Cal. Civ. Code § 51....4

Cal. Educ. Code
§ 220....4
§ 221.5....4

**Laws** **Page(s)**

Cal. Gov't Code
§ 12926 .......... 4
§ 12940 .......... 4
§ 12949 .......... 4
§ 12955 .......... 4

Cal. Health & Safety Code
§ 118600 .......... 24

Cal. Penal Code
§ 422.55 .......... 4
§ 422.56 .......... 4

*Colorado*

Colo. Rev. Stat.
§ 22-1-143 .......... 4
§ 24-34-301 .......... 4
§ 24-34-402 .......... 4
§ 24-34-502 .......... 4
§ 24-34-601 .......... 4

*Connecticut*

Conn. Gen. Stat.
§ 10-15c .......... 4
§ 46a-51 .......... 4
§ 46a-60 .......... 4
§ 46a-64 .......... 4
§ 46a-64c .......... 4

*Delaware*

Del. Code Ann.
tit. 6, § 4501 .......... 4
tit. 6, § 4603 .......... 4
tit. 19, § 711 .......... 4

**Laws** **Page(s)**

*Hawai'i*

Haw. Rev. Stat.
§ 489-2 ....................4
§ 489-3 ....................4
§ 515-2 ....................4
§ 515-3 ....................4

*Idaho*

Idaho Stat. Ann.
Ann. § 18-4117 .................... 26
Ann. § 36-6705 .................... 28
Ann. § 67-9802 .................... 28

*Illinois*

410 Ill. Comp. Stat.
35/25 .................... 24

775 Ill. Comp. Stat.
5/1-102 ....................4
5/1-103 ....................4
5/5-101 ....................4
5/5-102 ....................4

*Maine*

Me. Rev. Stat. Ann. tit. 5,
§ 4553....................4
§ 4571....................4
§ 4581....................4
§ 4591....................4
§ 4601....................4

*Maryland*

Md. Code Ann., Educ. § 26-704 ....................4

**Laws** **Page(s)**

Md. Code Ann., State Gov't
§ 20-304 ........................................ 4
§ 20-606 ........................................ 4
§ 20-705 ........................................ 4

*Massachusetts*

Mass. Gen. Laws
ch. 4, § 7, fifty-ninth ........................................ 4
ch. 76, § 5 ........................................ 4
ch. 151B, § 4 ........................................ 4
ch. 272, § 92A ........................................ 4
ch. 272, § 98 ........................................ 4

*Michigan*

Mich. Comp. Laws § 37.2102 ........................................ 4

*Minnesota*

Minn. Stat.
§ 363A.03 ........................................ 4
§ 363A.08 ........................................ 4
§ 363A.09 ........................................ 4
§ 363A.11 ........................................ 4
§ 363A.13 ........................................ 4

*Nevada*

Nev. Rev. Stat.
§ 118.100 ........................................ 4
§ 613.330 ........................................ 4
§ 651.070 ........................................ 4

**Laws** **Page(s)**

*New Hampshire*

N.H. Rev. Stat. Ann.
§ 354-A:2 ........ 4
§ 354-A:6 ........ 4
§ 354-A:8 ........ 4
§ 354-A:16 ........ 4
§ 354-A:27 ........ 4

*New Jersey*

N.J. Stat. Ann.
§ 10:5-5 ........ 4
§ 10:5-12 ........ 4
§ 18A:36-41 ........ 5

*New Mexico*

N.M. Stat. Ann.
§ 28-1-2 ........ 5
§ 28-1-7 ........ 5
§ 28-24-3 ........ 5

*New York*

N.Y. Civil Rights Law
§ 79-p ........ 24

N.Y. Education Law
§ 409-m ........ 24

N.Y. Exec. Law
§ 291 ........ 5
§ 296 ........ 5

*Oregon*

Or. Rev. Stat.
§ 174.100 ........ 5
§ 659.850 ........ 5
§ 659A.006 ........ 5

**Laws** **Page(s)**

*Rhode Island*

R.I. Gen. Laws
§ 11-24-2 ....................5
§ 23-27.3-702 ....................24
§ 28-5-6 ....................5
§ 28-5-7 ....................5
§ 34-37-3 ....................5
§ 34-37-4 ....................5

*Utah*

Utah Code Ann.
§ 34A-5-106....................5
§ 57-21-5 ....................5

*Vermont*

Vt. Stat. Ann.
tit. 1, § 144....................5
tit. 9, § 4502....................5
tit. 9, § 4503....................5
tit. 18, § 1792....................24
tit. 21, § 495....................5

*Washington*

Wash. Rev. Code Ann.
§ 28A.642.010 ....................5
§ 49.60.030....................5
§ 49.60.040....................5
§ 49.60.180....................5
§ 49.60.215....................5
§ 49.60.222....................5

**Laws** **Page(s)**

*District of Columbia*

D.C. Code
§ 2-1401.02 ....................5
§ 2-1402.11 ....................5
§ 2-1402.21 ....................5
§ 2-1402.31 ....................5
§ 2-1402.41 ....................5

D.C. Mun. Regs.
tit. 4. § 802.2 ....................24

**Rule** **Page(s)**

Fed. R. App. P. 29 ....................1

**Miscellaneous Authorities**

AARP, *Dignity 2022: The Experience of LGBTQ Older Adults*, (June 2022), https://www.aarp.org/content/dam/aarp/research/surveys_statistics/life-leisure/2022/lgbtq-community-dignity-2022-report.doi.10.26419-2Fres.00549.001.pdf ....................11

AARP, *Dignity 2024: The Experience of LGBTQ+ Older Adults*, (August 2024), https://www.aarp.org/content/dam/aarp/research/topics/social-leisure/relationships/lgbtq-dignity-series-2024.doi.10.26419-2fres.00805.001.pdf ....................10

Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappan (Sept. 1, 2016), https://kappanonline.org/arenas-gunckel-smith-7-reasons-for-accommodating-transgender-students-school/ ....................20

**Miscellaneous Authorities** **Page(s)**

American Medical Ass'n, *Issue Brief: Transgender Individuals' Access to Public Facilities* 3 (2025), *https://www.ama-assn.org/system/files/transgender-public-facilities-issue-brief.pdf* ........ 12, 14

Am. Psych. Ass'n (APA), *Answers to Your Questions About Transgender People, Gender Identity, and Gender Expression* (3d ed. 2014), https://www.apa.org/topics/lgbtq/transgender.pdf ........ 3

Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psych. 832 (2015), https://www.apa.org/practice/guidelines/transgender.pdf ........ 3

Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y 70 (2019), https://link.springer.com/article/10.1007/s13178-018-0335-z [https://web.archive.org/web/20261016140801/https://link.springer.com/article/10.1007/s13178-018-0335-z?] ........ 17

April J. Ancheta et al., *The Impact of Positive School Climate on Suicidality and Mental Health Among LGBTQ Adolescents: A Systematic Review 2* (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8142116/pdf/nihms-1699098.pdf ........ 8

Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 Frontiers Socio. 1, 8 (Mar. 31, 2021), https://www.frontiersin.org/articles/10.3389/fsoc.2021.652777/full ........ 20

Brandon Truitt, *Woman Says Security Guard at Liberty Hotel in Boston Confronted Her in Bathroom, Asked to Prove Gender*, CBS News (May 7, 2025), https://www.cbsnews.com/boston/news/women-boston-liberty-hotel-bathroom-gender/ ........ 21

**Miscellaneous Authorities** **Page(s)**

Cady Stanton, *As 'Don't Say Gay' and Similar Bills Take Hold, LGBTQ Youths Feel They're 'Getting Crushed', USA Today*, https://www.usatoday.com/story/news/education/2022/05/09/dont-say-gay-lgbtq-youth-reaction/7398468001/ ....................8

Carlos Maza & Rachel Percelay, *Texas Experts Debunk the Transgender "Bathroom Predator" Myth Ahead of HERO Referendum*, Media Matters for Am. (Oct. 15, 2015), https://www.mediamatters.org/sexual-harassment-sexual-assault/texas-experts-debunk-transgender-bathroom-predator-myth-ahead-hero .................... 17

Catherine S. J. Wall et al., "An Environment of Fear No Matter Where I Go": A Mixed-Methods Examination of Transgender and Gender Diverse Experiences While Facing Antitransgender Legislation (2026), https://psycnet.apa.org/doiLanding?doi=10.1037%2Famp0001683 .......... 12

Christopher Wiggins, *Cis Woman Mistaken as Transgender Records Being Berated in Bathroom*, Advocate (May 26, 2023), https://www.advocate.com/news/2022/11/01/cis-woman-mistaken-transgender-records-being-berated-bathroom.................... 21

Christopher Wiggins, *Cis Woman Confronted by Police Officers in Arizona Walmart Restroom for Looking Too Masculine Speaks Out (Exclusive)*, Advocate (Feb. 28, 2025), https://www.advocate.com/news/lesbian-mistaken-transgender-arizona-walmart.................... 22

Crosby Burns et al., *Gay and Transgender Discrimination in the Public Sector: Why It's a Problem for State and Local Governments, Employees, and Taxpayers* (Ctr. for Am. Progress & AFSCME 2012), https://www.americanprogress.org/article/gay-and-transgender-discrimination-in-the-public-sector/.................... 11

David Crary, *Debate Over Transgender Bathroom Access Spreads Nationwide*, Salt Lake Trib. (May 10, 2016), https://archive.sltrib.com/article.php?id=3875520&itype=CMSID........... 20

**Miscellaneous Authorities** **Page(s)**

Donald Padgett, *Walmart Fires 6'4" Cisgender Woman Threatened by Man Who Thought She Was Trans*, Advocate (Mar. 28, 2025), https://www.advocate.com/news/walmart-fires-mistaken-trans-woman ........ 21

Fox News, *Manafort on Trump's Fight to Rally GOP, Defeat Democrats; Gov. McCrory on Showdown Over NC's Transgender Bathroom Law* (Jan. 23, 2017), https://archive.fo/LLJkG ........ 18

Gerika Mudra, *I Filed a Discrimination Charge for What Happened to Me in a Buffalo Wild Wings Bathroom*, MSNBC (Aug. 15, 2025), https://www.msnbc.com/opinion/msnbc-opinion/minnesota-buffalo-wild-wings-server-teen-bathroom-gender-rcna225076?utm_source=substack&utm_medium=email........ 22

German Lopez, *Myth #3: Letting Trans People Use the Bathroom or Locker Room Matching Their Gender Identity Is Dangerous*, Vox (Nov. 14, 2018), https://www.vox.com/identities/2016/5/13/17938102/transgender-people-bathrooms-locker-rooms-schools [https://web.archive.org/web/20261016145603/https://www.vox.com/identities/2016/5/13/17938102/transgender-people-bathrooms-locker-rooms-schools] ........ 19

Glisten, *The 2025 National School Climate Survey: School experiences of LGBTQ+ Youth in the U.S.*; https://glisten.org/nscs2025/#keyfindings ........ 6,8

Glisten, *Research Brief: School Experiences and Outcomes Among Transgender, Nonbinary, and Gender-Expansive Young People (2026)*; https://glisten.org/wp-content/uploads/2026/08/bebd482e-school-experiences-and-outcomes-among-transgender-nonbinary-and-gender-expansive-young-people-1.pdf........6

Jaime M. Grant et al., Nat'l Ctr. For Transgender Equality and Nat'l Gay & Lesbian Task Force, *Injustice at Every Turn: A Report of* the National Transgender Discrimination Survey 51 (2011) https://www.thetaskforce.org/app/uploads/2019/07/ntds_full.pdf........9

**Miscellaneous Authorities** **Page(s)**

Jody L. Herman et al., Williams Inst., *How Many Adults and Youth Identify as Transgender in the United States?* (Aug. 2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Aug-2025.pdf ....................3

Jody L. Herman et al., Williams Inst., *Safety and Privacy in Public Restrooms and Other Gendered Facilities* (Feb. 2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Bathroom-Access-Feb-2025.pdf.................... 13, 17

Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 65 (2013), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Restrooms-Minority-Stress-Jun-2013.pdf............. 9, 12, 14

Jody L. Herman, Jody L. Herman, *The Cost of Employment and Housing Discrimination against Transgender Residents of New York* (Williams Inst. 2013), https://escholarship.org/uc/item/7j08z94p .................... 11

Kerith J. Conron et al., Williams Inst., *Educational Experiences of Transgender People* (Apr. 2022), https://pointfoundation.org/hubfs/Research%20Reports/2111-Trans-Higher-Ed-FINAL.pdf ....................3

Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223 (Mar. 2016)), https://pmc.ncbi.nlm.nih.gov/articles/PMC4771131/pdf/PEDS_20153223.pdf .................... 15

Letter from William G. Brooks III, Mass. Chiefs of Police Ass'n, & Bryan A. Kyes, Mass. Majority City Chiefs, to Sen. William N. Brownsberger & Rep. John V. Fernandes, Joint Comm. on the Judiciary (Oct. 1, 2015), https://www.mass.gov/files/documents/2016/08/wj/ew-le.pdf .................... 21

**Miscellaneous Authorities** **Page(s)**

Matt DeRienzo, *Woman Mistaken for Transgender Harassed in Walmart Bathroom*, News-Times (May 16, 2016), https://www.newstimes.com/local/article/Woman-mistaken-for-transgender-harassed-in-7471666.php ..................................................... 21

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 67-70 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6348759/pdf/mm6803a3.pdf. ....................................................................................6

Movement Advancement Project, *Equality Maps: Local Nondiscrimination Ordinances* (current as of June 4, 2026), https://archive.fo/H6PZP ...................................................................5

Myeshia Price-Feeney et al., *Impact of Bathroom Discrimination on Mental Health Among Transgender and Nonbinary Youth*, 68 J. Adolescent Health 1142 (2021), https://www.jahonline.org/article/S1054-139X(20)30653-4/fulltext........... 12

Nat'l Resource Ctr. on LGBT Aging, *Inclusive Services for LGBT Older Adults A Practical Guide To Creating Welcoming Agencies* (2012), *https://lgbtagingcenter.org/wp-content/uploads/sites/6/2025/08/Sage_GuidebookFINAL1.pdf* ........... 10

Sam Donndelinger & Spencer Macnaughton, *What It Actually Looks Like When Trans People Follow Bathroom Bans*, Uncloseted Media (May 17, 2025), *https://www.unclosetedmedia.com/p/what-it-actually-looks-like-when* ........................................................................................... 13

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *Early Insights: A Report of the 2022 U.S. Transgender Survey* (2024), https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf .... 6, 10, 15

**Miscellaneous Authorities** **Page(s)**


Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf ........ 11, 13

Shoshana K. Goldberg et al., Hum. Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (2023), https://reports.hrc.org/2023-lgbtq-youth-report ........7

Soon Kyu Choi & Ilan H. Meyer, Williams Inst., *LGBT Aging: A Review of Research Findings, Needs, and Policy Implications* (Aug. 2016), https://www.sageusa.org/wp-content/uploads/2025/08/sageusa-williams-institute-lgbt-aging-research-review.pdf ........ 10

StopBullying.gov, *Facts About Bullying* (Oct. 9, 2024), *https://www.stopbullying.org/resources/facts* ........7

Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* (Wash. Off. of Superintendent of Pub. Instruction 2012), https://ospi.k12.wa.us/sites/default/files/2023-08/prohibiting_discrimination_in_washington_public_schools_february2012revisedsep2019disclaimer_1.pdf ........ 23

Taylor N.T. Brown & cost L. Herman, *The Cost of Employment Discrimination against Transgender Residents of Florida* (Williams Inst. 2015), https://escholarship.org/uc/item/6mn5c8s7 ........ 11

The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People* (2023), https://www.thetrevorproject.org/survey-2023/assets/static/05_TREVOR05_2023survey.pdf ........8

What We Know Project, Cornell Univ., *What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?* (2019), https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-scholarly-research-say-about-the-effects-of-discrimination-on-the-health-of-lgbt-people/ ........7

**Miscellaneous Authorities** **Page(s)**

Will Doran, *Equality NC Director: No Public Safety Risks in Cities with Transgender Anti-Discrimination Rules*, PolitiFact (Apr. 1, 2016), https://www.politifact.com/factchecks/2016/apr/01/chris-sgro/equality-nc-director-no-public-safety-risks-cities/ .............................. 18

## INTERESTS OF THE AMICI STATES

The States of Washington, New York, California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, Virginia, District of Columbia file this brief as amici curiae in support of plaintiffs-appellees, six transgender Idahoans and a provisional class that they represent, who challenge an Idaho statute that criminalizes ordinary restroom use for transgender people in government-owned buildings and places of public accommodation. *See* Fed. R. App. P. 29(a)(2). Amici States urge this Court to affirm the district court's narrow preliminary injunction order permitting plaintiffs, during the pendency of this lawsuit, to continue using restrooms that are consistent with their gender identity and appearance without fear of criminal prosecution—with certain restrictions. Specifically, the preliminary injunction allows plaintiffs to use any single-user restroom that is consistent with their gender identity and, if a single-user restroom is not available, to use a multi-occupancy restroom.

Amici States strongly support the right of transgender people to live with dignity, be free from discrimination, and have equal access to government-sponsored opportunities and other incidents of life, including equal access to restrooms. Discrimination against individuals solely because of their transgender status causes serious economic, educational, emotional, and

health harms. To prevent these injuries, amici States have adopted policies aimed at combatting discrimination against transgender people. Amici States submit this brief to describe their experiences with administering such policies, including policies that maintain sex-separated restrooms while allowing transgender individuals to use restrooms consistent with their gender identity. As amici's experiences show, ensuring transgender people have access to restrooms consistent with their gender identity benefits all, without compromising safety or privacy.

Amici States also share a strong interest in an interpretation of the federal Constitution in a manner that supports and supplements the efforts of amici States to protect against discrimination on the basis of sex or transgender status. The statute at issue here, Idaho House Bill 752, discriminates against transgender people without advancing safety or enhancing bodily privacy, which is already protected in restrooms, as this Court has previously observed. Because the law does not further any important government interest, its only function is to stigmatize transgender people for their gender identity. Such a law violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

# ARGUMENT

## I. PROTECTING TRANSGENDER PEOPLE FROM DISCRIMINATION CONFERS WIDE SOCIETAL BENEFITS WITHOUT COMPROMISING THE PRIVACY OR SAFETY OF OTHERS

Over 2.8 million people in the United States identify as transgender, including approximately 9,600 adults and 5,300 youth in Idaho.[1] Transgender people have been part of cultures worldwide "from antiquity to the present day."[2] They contribute to our communities in myriad ways, including as students, teachers, essential workers, firefighters, police officers, lawyers, nurses, and doctors.

Unfortunately, transgender people often experience discrimination that limits their ability to realize their potential. To combat such discrimination, States began providing civil rights protections for transgender people over a

---

[1] Jody L. Herman et al., Williams Inst., *How Many Adults and Youth Identify as Transgender in the United States?* 2, 7, 13 (Aug. 2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Aug-2025.pdf; *see also* Kerith J. Conron et al., Williams Inst., *Educational Experiences of Transgender People* 2 (Apr. 2022), https://pointfoundation.org/hubfs/Research%20Reports/2111-Trans-Higher-Ed-FINAL.pdf. (For authorities available online, full URLs appear in the table of authorities. All URLs were last visited on October 16, 2026. Authorities not online are available from the amici states on request.)

[2] Am. Psych. Ass'n (APA), *Answers to Your Questions About Transgender People, Gender Identity, and Gender Expression* 1 (3d ed. 2014) https://www.apa.org/topics/lgbtq/transgender.pdf; *see also* APA, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psych. 832, 834 (2015), https://www.apa.org/practice/guidelines/transgender.pdf.

quarter century ago. Today, at least twenty-one States and the District of Columbia[3] offer express protections against discrimination based on gender

[3] **California**: Cal. Civ. Code § 51(b), (e)(6) (public accommodations); Cal. Educ. Code § 220 (education); *id.* § 221.5(f) (education and school athletic participation); Cal. Gov't Code §§ 12926(o), (r)(2), 12940(a), 12949 (employment); *id.* § 12955 (housing); Cal. Penal Code §§ 422.55, 422.56(c) (hate crimes). **Colorado**: Colo. Rev. Stat. § 24-34-301(9), (10) (definitions); *id.* § 24-34-402 (employment); *id.* § 24-34-502 (housing); *id.* § 24-34-601 (public accommodations); *id.* § 22-1-143 (education). **Connecticut**: Conn. Gen. Stat. § 10-15c (schools); *id.* § 46a-51(21) (definition); *id.* § 46a-60 (employment); *id.* § 46a-64 (public accommodations); *id.* § 46a-64c (housing). **Delaware**: Del. Code Ann. tit. 6, § 4501 (public accommodations); *id.* tit. 6, § 4603(b) (housing); *id.* tit. 19, § 711 (employment). **Hawai'i**: Haw. Rev. Stat. § 489-2 (definition); *id.* § 489-3 (public accommodations); *id.* § 515-2 (definition); *id.* § 515-3 (housing). **Illinois**: 775 Ill. Comp. Stat. 5/1-102(A) (employment, real estate transactions, access to financial credit, public accommodations, including in education); *id.* 5/1-103(O-1) (definition); *id.* § 5/5-101(A)(11) (defining place of public accommodation to include "place of education"); *id.* § 5/5-102 (civil rights violations in public accommodations). **Maine**: Me. Rev. Stat. Ann. tit. 5, § 4553(5-C) (definition); *id.* § 4571 (employment); *id.* § 4581 (housing); *id.* § 4591 (public accommodations); *id.* § 4601 (education). **Maryland**: Md. Code Ann., State Gov't § 20-304 (public accommodations); *id.* § 20-606 (employment); *id.* § 20-705 (housing); Md. Code Ann., Educ. § 26-704 (schools and educational programs). **Massachusetts**: Mass. Gen. Laws ch. 4, § 7, fifty-ninth (definition); *id.* ch. 76, § 5 (education); *id.* ch. 151B, § 4 (employment, housing, credit); *id.* ch. 272, §§ 92A, 98 (public accommodations) (as amended by Ch. 134, 2016 Mass. Acts). **Michigan**: Mich. Comp. Laws § 37.2102(1) (employment, housing, public accommodations, public service, education). **Minnesota**: Minn. Stat. § 363A.03(50) (definition); *id.* § 363A.08 (employment); *id.* § 363A.09 (housing and real estate transactions); *id.* § 363A.11 (public accommodations); *id.* § 363A.13 (education). **Nevada**: Nev. Rev. Stat. § 118.100 (housing); *id.* § 613.330 (employment); *id.* § 651.070 (public accommodations). **New Hampshire**: N.H. Rev. Stat. Ann. § 354-A:2(XIV-e) (definition); *id.* § 354-A:6 (employment); *id.* § 354-A:8 (housing); *id.* § 354-A:16 (public accommodations); *id.* § 354-A:27 (education). **New Jersey**: N.J. Stat. Ann. § 10:5-5(rr) (definition); *id.* § 10:5-12 (public accommodations, housing and real estate transactions, employment);

(*continued on the next page*)

identity in areas such as education, housing, public accommodations, and employment.[4] And at least 390 municipalities explicitly prohibit discrimination based on sexual orientation or gender identity in employment, housing, or public accommodations.[5] As the experiences of amici States and other jurisdictions show, these policies promote inclusive environments that benefit all.

---

*id.* § 18A:36-41(8) (directing issuance of guidance to school districts permitting transgender students "to participate in gender-segregated school activities in accordance with the student's gender identity"). **New Mexico**: N.M. Stat. Ann. § 28-1-2(T)-(U) (definitions); *id.* § 28-1-7(A) (employment); *id.* § 28-1-7(F) (public accommodations); *id.* § 28-1-7(G) (housing and real property). **New York**: N.Y. Exec. Law §§ 291, 296 (education, employment, public accommodations, housing). **Oregon**: Or. Rev. Stat. § 174.100(4) (definition); *id.* § 659.850 (education); *id.* § 659A.006 (employment, housing, public accommodations). **Rhode Island**: R.I. Gen. Laws § 11-24-2 (public accommodations); R.I. Gen. Laws §§ 28-5-6(12), 28-5-7 (employment); R.I. Gen. Laws §§ 34-37-3(9), 34-37-4 (housing). **Utah**: Utah Code Ann. § 34A-5-106 (employment); *id.* § 57-21-5 (housing). **Vermont**: Vt. Stat. Ann. tit. 1, § 144 (definition); *id.* tit. 9, § 4502 (public accommodations); *id.* tit. 9, § 4503 (housing); *id.* tit. 21, § 495 (employment). **Washington**: Wash. Rev. Code Ann. § 28A.642.010 (education); *id.* § 49.60.030(1)(a)-(e) (employment, public accommodations, real estate transactions, credit transactions, and insurance transactions); *id.* § 49.60.040(28)–(29) (definition); *id.* § 49.60.180 (employment); *id.* § 49.60.215 (public accommodations); *id.* § 49.60.222 (housing). **District of Columbia**: D.C. Code § 2-1401.02(12A-i) (definition); *id.* § 2-1402.11 (employment); *id.* § 2-1402.21 (housing and other real property transactions); *id.* § 2-1402.31 (public accommodations); *id.* § 2-1402.41 (education).

[4] The U.S. Supreme Court has confirmed that longstanding federal law similarly prohibits employment discrimination based on gender identity. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 662 (2020).

[5] Movement Advancement Project, Equality Maps: Local Nondiscrimination Ordinances (current as of January 1, 2026).

### A. Transgender People Face Pervasive and Harmful Discrimination That Causes Them Serious Harms

As the Supreme Court has recognized, "invidious discrimination in the distribution of publicly available goods, services, and other advantages cause[s] unique evils." *Roberts v. U. S. Jaycees*, 468 U.S. 609, 628 (1984). Transgender people are often subject to such discrimination.

Starting from an early age, transgender people experience high levels of discrimination, violence, and harassment in schools.[6] In the 2022 U.S. Transgender Survey (USTS), over three quarters (80%) of adult respondents who were known or perceived as transgender in grades K-12 reported negative experiences at school, including being harassed or attacked.[7] In another 2022

---

[6]Glisten, *The 2025 National School Climate Survey: School experiences of LGBTQ+ Youth in the U.S.*, https://glisten.org/nscs2025/#keyfindings [https://web.archive.org/web/20261016164530/https://glisten.org/nscs2025/#keyfindings] (n.d.) (see "Key Findings"); *see also* Glisten, *Research Brief: School Experiences and Outcomes Among Transgender, Nonbinary, and Gender-Expansive Young People* 3 (Aug. 2026), https://glisten.org/wp-content/uploads/2026/08/bebd482e-school-experiences-and-outcomes-among-transgender-nonbinary-and-gender-expansive-young-people-1.pdf; Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 67-70 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6348759/pdf/mm6803a3.pdf.

[7] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *Early Insights: A Report of the 2022 U.S. Transgender Survey* 22 (2024), https://transequality.org/sites/default/files/2024-02/2022 USTS Early Insights Report_FINAL.pdf.

survey of LGBTQ+ teenagers, nearly two in three (62.6%) transgender and gender-expansive youth respondents reported being "teased, bullied, or treated badly" at school in the prior year, and more than half (55.6%) of such youth reported being victimized specifically due to their sexual identity, gender identity, and/or gender expression.[8] In the same survey, nearly three in five (56.9%) LGBTQ+ youth respondents reported being verbally or physically harassed at least once in the prior thirty days.[9] By contrast, just under one in five (19.2%) of all students ages 12-18 and enrolled in grades 6-12 reported being bullied during the 2021-2022 school year.[10]

Research has demonstrated that discrimination against LGBTQ individuals "increases the risks of poor mental and physical health."[11] For

---

[8] Shoshana K. Goldbeg et al., Human Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (2023), https://reports.hrc.org/2023-lgbtq-youth-report [https://web.archive.org/web/20261016152056/https://reports.hrc.org/2023-lgbtq-youth-report].

[9] *Id*.

[10] StopBullying.gov, *Facts About Bullying* (Oct. 9, 2024), https://www.stopbullying.gov/resources/facts [https://web.archive.org/web/20261016152303/https://www.stopbullying.gov/resources/facts] (scroll down to "How Common Is Bullying").

[11] What We Know Project, Cornell Univ., *What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?* (2019), https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-scholarly-research-say-about-the-effects-of-discrimination-on-the-health-of-lgbt-people/https://web.archive.org/web/20261016153426/https://whatweknow.ineq

(*continued on the next page*)

example, LGBTQ students who experienced discriminatory policies or practices in school were found to have lower grades and worse mental health and self-esteem than students who had not encountered such discrimination.[12] Four in ten transgender and nonbinary youth in a 2025 mental health survey reported having seriously considered suicide in the prior twelve months.[13] Positive school climates, on the other hand, have been linked to lower suicidality in LGBTQ youth.[14]

---

uality.cornell.edu/topics/lgbt-equality/what-does-scholarly-research-say-about-the-effects-of-discrimination-on-the-health-of-lgbt-people/ [https://web.archive.org/web/20261016153426/https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-scholarly-research-say-about-the-effects-of-discrimination-on-the-health-of-lgbt-people/ ].

[12] Glisten, *The 2025 National School Climate Survey*, *supra*, at ; *see also* April J. Ancheta et al., *The Impact of Positive School Climate on Suicidality and Mental Health Among LGBTQ Adolescents: A Systematic Review* 2 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8142116/pdf/nihms-1699098.pdf (published at 37 J. Sch. Nursing 75).

[13] The Trevor Project, *2025 U.S. National Survey on the Mental Health of LGBTQ Young People* 3 (2025), https://www.thetrevorproject.org/survey-2023/assets/static/05_TREVOR05_2023survey.pdf.

[14] Ancheta et al., *The Impact of Positive School Climate*, *supra*, at 7; *see also* Cady Stanton, *As 'Don't Say Gay' and Similar Bills Take Hold, LGBTQ Youths Feel They're 'Getting Crushed'*, USA Today (updated May 11, 2022), https://www.usatoday.com/story/news/education/2022/05/09/dont-say-gay-lgbtq-youth-reaction/7398468001/ [https://web.archive.org/web/20261016142635/https://www.usatoday.com/story/news/education/2022/05/09/dont-say-gay-lgbtq-youth-reaction/7398468001/] (noting that LGBTQ youths in affirming schools were nearly 40% less likely to attempt suicide than LGBTQ youths in nonaffirming schools).

In their adult lives, transgender people continue to face pervasive discrimination in the workplace. One study found that transgender people report "[n]ear universal harassment on the job," including verbal harassment, intrusive questions about surgical status, denial of access to restrooms, and physical and sexual assault.[15] Nearly all of those surveyed (90%) had experienced "harassment or mistreatment on the job or [taken] actions to avoid it."[16] A majority of the survey respondents (57%) had delayed their gender transition, and even more (71%) felt compelled to hide their gender identity for some period of time.[17] The stress of job-related discrimination and harassment causes transgender workers to change or quit jobs; experience poor job performance, absence, or tardiness; and suffer underemployment (working in a field or position for which they are overqualified).[18] And in another study, more than one in ten (11%) respondents who had ever held a job said that they

---

[15] Jaime M. Grant et al., Nat'l Ctr. for Transgender Equality and Nat'l Gay & Lesbian Task Force, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 51, 56 (2011), https://www.thetaskforce.org/app/uploads/2019/07/ntds_full.pdf.

[16] *Id.* at 51.

[17] *Id.* at 63.

[18] *Id.* at 55; Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 65, 75 (2013), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Restrooms-Minority-Stress-Jun-2013.pdf.

had been fired, forced to resign, lost the job, or been laid off because of their gender identity or expression.[19]

Older transgender individuals also experience significant discrimination. Older transgender individuals face discrimination in healthcare settings, where interactions may be more frequent due to age-related physical conditions.[20] Research also suggests that older LGBT individuals are less likely than heterosexual elders to access senior centers, meal programs, and other entitlement programs because they fear discrimination or harassment if their sexual orientations or gender identities become known.[21] And older transgender individuals widely report fearing

---

[19] James et al., *Early Insights*, *supra*, at 21.

[20] *See* Soon Kyu Choi & Ilan H. Meyer, Williams Inst., *LGBT Aging: A Review of Research Findings, Needs, and Policy Implications* 3, 8, 14 (Aug. 2016), *https://www.sageusa.org/wp-content/uploads/2025/08/sageusa-williams-institute-lgbt-aging-research-review.pdf*; AARP, *Dignity 2024: The Experience of LGBTQ Older Adults* 29 (Aug. 2024), https://www.aarp.org/content/dam/aarp/research/topics/social-leisure/relationships/lgbtq-dignity-series-2024.doi.10.26419-2fres.00805.001.pdf.

[21] *See* Nat'l Resource Ctr. on LGBT Aging, *Inclusive Services for LGBT Older Adults: A Practical Guide to Creating Welcoming Agencies* 4 (2012), https://lgbtagingcenter.org/wp-content/uploads/sites/6/2025/08/Sage_GuidebookFINAL1.pdf.

discrimination related to renting a home, buying a home, or accessing housing options for older adults.[22]

Further, transgender people experience disproportionately higher rates of unemployment, poverty and poverty, and are far more likely to be unhoused than the population as a whole.[23] Such outcomes harm transgender people and also impair the economies and fiscs of their States.[24]

---

[22] AARP, *Dignity 2022: The Experience of LGBTQ Older Adults* 32, 34 (June 2022), https://www.aarp.org/content/dam/aarp/research/surveys_statistics/life-leisure/2022/lgbtq-community-dignity-2022-report.doi.10.26419-2Fres.00549.001.pdf.

[23] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 140-45, 178 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

[24] *See* Taylor N.T. Brown & Jody L. Herman, *The Cost of Employment Discrimination against Transgender Residents of Florida* (Williams Inst. 2015), https://escholarship.org/uc/item/6mn5c8s7 [https://web.archive.org/web/20261016153054/https://escholarship.org/uc/item/6mn5c8s7]; Jody L. Herman, *The Cost of Employment and Housing Discrimination against Transgender Residents of New York* (Williams Inst. 2013), https://escholarship.org/uc/item/7j08z94p [https://web.archive.org/web/20261016150148/https://escholarship.org/uc/item/7j08z94p]; Crosby Burns et al., *Gay and Transgender Discrimination in the Public Sector: Why It's a Problem for State and Local Governments, Employees, and Taxpayers* (Ctr. for Am. Progress & AFSCME 2012), https://www.americanprogress.org/article/gay-and-transgender-discrimination-in-the-public-sector/ [https://web.archive.org/web/20261016144220/https://www.americanprogress.org/article/gay-and-transgender-discrimination-in-the-public-sector/].

The American Medical Association (AMA) has specifically recognized that policies excluding transgender individuals from sex-separated facilities consistent with their gender identity, including discriminatory restroom policies, have "detrimental effects on the health, safety and well-being of those individuals."[25] For example, more than half (54%) of respondents in a study of transgender people reported negative health effects from avoiding public restrooms, such as kidney infections and other kidney-related problems.[26] And a 2021 study found that denial of access to restroom facilities significantly increased the odds of transgender and/or nonbinary youth reporting depressive mood and suicidality—one in three youths who faced restroom discrimination reported engaging in suicidal behavior in the past year.[27]

---

[25] American Medical Ass'n, *Issue Brief: Transgender Individuals' Access to Public Facilities* 3 (2025), https://www.ama-assn.org/system/files/transgender-public-facilities-issue-brief.pdf.

[26] Herman et al., *Gendered Restrooms and Minority Stress*, *supra*, at 75, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Restrooms-Minority-Stress-Jun-2013.pdf ; *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 593, 600, 603, 617 (4th Cir. 2020).

[27] Myeshia Price-Feeney et al., *Impact of Bathroom Discrimination on Mental Health Among Transgender and Nonbinary Youth*, 68 J. of Adolescent Health 1142 (2021), https://www.jahonline.org/article/S1054-139X(20)30653-4/fulltext [https://web.archive.org/web/20261016151445/https://www.jahonline.org/article/S1054-139X(20)30653-4/fulltext]; Catherine S. J. Wall et al., "*An Environment of Fear No Matter Where I Go": A Mixed-Methods Examination of Transgender and Gender Diverse Experiences While Facing Antitransgender*

(*continued on the next page*)

Transgender people are also more likely to face verbal harassment and physical assault when they generally live their day-to-day lives according to their gender identity but are required to use the restroom of their sex assigned at birth.[28] And such bans create cognitive dissonance: as one transgender man explained regarding his mandatory use of women's restrooms in Ohio, "As a masculine person with a very obvious beard, I feel like my bathroom is the men's bathroom."[29] Measures that transgender people take to mitigate these risks present their own health harms: To avoid facing such harassment in restrooms, nearly three in five (59%) of transgender people reported in a survey that they had avoided using a public restroom, and nearly one in three (32%) limited the amount they ate or drank, at least once in the previous year.[30] In

---

*Legislation*, 81(6) American Psychologist 843-855 (2026), https://psycnet.apa.org/doiLanding?doi=10.1037%2Famp0001683 [https://web.archive.org/web/20261016200430/https://psycnet.apa.org/doiLanding?doi=10.1037%2Famp0001683].

[28] Jody L. Herman et al., *Safety and Privacy in Public Restrooms and Other Gendered Facilities* 3-4 (Feb. 2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Bathroom-Access-Feb-2025.pdf.

[29] Sam Donndelinger & Spencer Macnaughton, *What It Actually Looks Like When Trans People Follow Bathroom Bans*, Uncloseted Media (May 17, 2025), https://www.unclosetedmedia.com/p/what-it-actually-looks-like-when [https://web.archive.org/web/20261016151707/https://www.unclosetedmedia.com/p/what-it-actually-looks-like-when].

[30] James et al., *The Report of the 2015 U.S. Transgender Survey*, *supra*, at 228-229.

another survey, fifty-four percent of transgender respondents reported physical problems from restroom avoidance, such as dehydration or incontinence.[31]

In sum, the AMA has concluded that discriminatory restroom policies can impose a range of distinct harms on transgender people—such policies can "undermine well-established treatment protocols for gender dysphoria, expose these individuals to stigma and discrimination as well as potential harassment and abuse and impair their social and emotional development, leading to poorer health outcomes throughout life."[32]

### B. The Amici States' Experiences Confirm That Protecting Transgender People from Discrimination in Restroom Access Yields Broad Benefits Without Compromising Privacy or Safety.

In amici States' experience, policies that allow transgender people to access restroom facilities consistent with their gender identity provide broad benefits for both transgender people and their communities. For example, California adopted such a policy in its schools to address documented harms suffered by transgender students, including students not drinking and eating

---

[31] Herman et al., *Gendered Restrooms and Minority Stress*, *supra*, at 75 ("One respondent explained, 'I had avoided using public bathrooms for so many years and would hold it when I needed to go that now my bladder is weaker.'").

[32] American Medical Ass'n, *Issue Brief: Transgender Individuals' Access to Public Facilities* 3, *supra*.

during the school day to avoid restroom use.[33] Such policies can reduce the health risks faced by transgender people. For example, transgender youth permitted to live consistently with their gender identity have mental health outcomes comparable to their cisgender peers.[34] And more recently, the 2022 USTS found that 94% of adult transgender individuals reported being either "a lot more satisfied" (79%) or "a little more satisfied" (15%) after choosing to live at least some of the time consistent with their gender identity.[35]

In the employment context, antidiscrimination protections benefit both employees and employers. In a brief submitted in connection with a challenge to a (since-repealed) North Carolina law similar to the Idaho law at issue here, some of the country's largest companies explained that policies protecting LGBTQ employees offer tangible advantages for employee recruitment and

---

[33] *See* Assemb. B. No. 1266, 2013-2014 Sess. (Cal. 2013), at 7. https://www.leginfo.ca.gov/pub/13-14/bill/asm/ab_1251-1300/ab_1266_bill_20130812_chaptered.pdf; Cal. Assemb. Comm. on Educ., Bill Analysis for Assemb. B. 1266, 2013-2014 Sess. (2013) https://www.leginfo.ca.gov/pub/13-14/bill/asm/ab_1251-1300/ab_1266_cfa_20130417_183007_asm_comm.html.

[34] *See* Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223, at 5-7 (Mar. 2016), https://pmc.ncbi.nlm.nih.gov/articles/PMC4771131/pdf/PEDS_20153223.pdf; Br. of Amici Curiae Sch. Adm'rs at 4, *Gloucester Cnty. Sch. Bd.*, 580 U.S. 1168.

[35] James et al., *Early Insights*, *supra* , at 17.

retention.[36] Such policies are attractive to workers. Research demonstrates that LGBTQ and non-LGBTQ workers prefer to work in States and for companies with inclusive policies and laws.[37] And the ability to use restrooms at work corresponding to one's gender identity plays a particularly significant role in transgender employees' levels of job satisfaction and consequent decisions to remain in their jobs. One survey of transgender employees who had *not* been forced to leave a job due to discrimination or harassment found that the overwhelming majority (86%) were able to use gender-appropriate restrooms.[38]

As noted above, at least twenty-one States, the District of Columbia, and hundreds of municipalities provide civil rights protections to transgender people, and those protections often include requirements that transgender people be allowed to use restrooms consistent with their gender identity. These requirements enable public accommodations to maintain sex-separated spaces while allowing transgender people to use a facility that aligns with their gender identity—thus helping to ease the stigma transgender people often experience, with positive effects for their physical and mental health. Such

---

[36] Amicus Curiae Br. by 68 Companies Opposed to H.B. 2 & in Support of Pl.'s Mot. for P.I. 16, *United States v. North Carolina*, No. 1:16-cv-425 (M.D.N.C. July 8, 2016), Dkt. No. 85-1.

[37] *Id.* at 16.

[38] Grant et al., *Injustice at Every Turn*, *supra*, at 61.

requirements promote compelling interests in "removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups," *Roberts*, 468 U.S. at 626. As explained below, those policies do so without threatening individual safety or privacy.

### 1. Nondiscriminatory restroom policies pose no safety concerns, but discriminatory restroom policies, like Idaho's H.B. 752, do

Although defendants claim that H.B. 752 "mitigates the risk of crime" (Appellants' Opening Br. at 38), no evidence supports this assertion.[39] To the contrary, an empirical study that compared criminal incident reports in Massachusetts localities with and without gender-inclusive public accommodations laws found that passage of gender-inclusive laws was not related to the number or frequency of criminal incidents in public restrooms—which are exceedingly rare in any event.[40] Another study that reviewed

---

[39] Herman, *Safety and Privacy*, *supra*, at 3.

[40] Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y 70, 80–83 (2019), https://link.springer.com/article/10.1007/s13178-018-0335-z [https://web.archive.org/web/20261016140801/https://link.springer.com/article/10.1007/s13178-018-0335-z]. *See also, e.g.*, Carlos Maza & Rachel Percelay, *Texas Experts Debunk the Transgender "Bathroom Predator" Myth Ahead of*

(*continued on the next page*)

incidents cited on websites as support for discriminatory public accommodations laws found only three cases nationwide in seventeen years in which a man was convicted of a crime involving entering a women's restroom or locker room dressed as a woman. Notably, none of the incidents occurred in cities with antidiscrimination ordinances or state laws, and it was not clear if any perpetrator was transgender.[41]

---

*HERO Referendum*, Media Matters for Am. (Oct. 15, 2015), https://www.mediamatters.org/sexual-harassment-sexual-assault/texas-experts-debunk-transgender-bathroom-predator-myth-ahead-hero [https://web.archive.org/web/20261016143154/https://www.mediamatters.org/sexual-harassment-sexual-assault/texas-experts-debunk-transgender-bathroom-predator-myth-ahead-hero] (officials in Austin, Dallas, and El Paso found no increase in restroom safety incidents as a result of cities' policies allowing transgender people to use restrooms consistent with their gender identity); Fox News, *Manafort on Trump's Fight to Rally GOP, Defeat Democrats; Gov. McCrory on Showdown Over NC's Transgender Bathroom Law* (updated Jan. 23, 2017), https://www.foxnews.com/transcript/manafort-on-trumps-fight-to-rally-gop-defeat-democrats-gov-mccrory-on-showdown-over-ncs-transgender-bathroom-law [https://web.archive.org/web/20261016182225/https://www.foxnews.com/transcript/manafort-on-trumps-fight-to-rally-gop-defeat-democrats-gov-mccrory-on-showdown-over-ncs-transgender-bathroom-law] (no known cases of people in North Carolina committing crimes in restrooms under the cover of protections provided to transgender people).

[41] Will Doran, *Equality NC Director: No Public Safety Risks in Cities with Transgender Anti-Discrimination Rules*, PolitiFact (Apr. 1, 2016), https://www.politifact.com/factchecks/2016/apr/01/chris-sgro/equality-nc-director-no-public-safety-risks-cities/ [https://web.archive.org/web/20261016153708/https://politifact.com/factchecks/2016/apr/01/chris-sgro/equality-nc-director-no-public-safety-risks-cities/].

As district courts have recognized, news stories relied on by Idaho to justify discriminatory restroom laws do not show that transgender individuals have assaulted girls in restrooms. One court noted that the safety-related examples invoked by Idaho were "unclear, exaggerated, or speculative." *See Sexuality & Gender All. v. Critchfield*, No. 1:23-cv-00315, 2025 WL 2256884, at *7 (D. Idaho Aug. 7, 2025). And the court below explained that "[o]ne incident from over ten years ago" was not sufficient to show that H.B. 752 materially advances Idaho's asserted safety interest, particularly where the conduct at issue in that incident was addressed by existing criminal statutes and prosecuted accordingly. (ER-21.)

Amici States' experience further confirms that gender-inclusive restroom policies do not increase safety concerns.[42] In States allowing transgender students to use restrooms corresponding to their gender identity, public schools have reported no instances of transgender students harassing others in restrooms or

---

[42] *See* German Lopez, *Myth #3: Letting Trans People Use the Bathroom or Locker Room Matching Their Gender Identity Is Dangerous*, Vox (Nov. 14, 2018), https://www.vox.com/identities/2016/5/13/17938102/transgender-people-bathrooms-locker-rooms-schools [https://web.archive.org/web/20261016145603/https://www.vox.com/identities/2016/5/13/17938102/transgender-people-bathrooms-locker-rooms-schools] (discussing States' experience).

locker rooms.[43] Indeed, the experiences of school administrators in thirty-one States and the District of Columbia show that public safety concerns are unfounded, as are concerns that students will pose as transgender simply to gain improper restroom access.[44] For instance, a former county sheriff noted that Washington State has protected transgender people from discrimination for a decade "with no increase in public safety incidents as a result"; he emphasized "that indecent exposure, voyeurism, and sexual assault[] are already illegal, and police use those laws to keep people safe."[45] And the Massachusetts Chiefs of Police Association and Massachusetts Majority City Chiefs expressed that

---

[43] Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappan (Sept. 1, 2016), https://kappanonline.org/arenas-gunckel-smith-7-reasons-for-accommodating-transgender-students-school/ [https://web.archive.org/web/20261016134336/https://kappanonline.org/arenas-gunckel-smith-7-reasons-for-accommodating-transgender-students-school/]; *see* Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 Frontiers Socio. 1, 8 (Mar. 31, 2021), https://www.frontiersin.org/articles/10.3389/fsoc.2021.652777/full [https://web.archive.org/web/20261016141424/https://www.frontiersin.org/journals/sociology/articles/10.3389/fsoc.2021.652777/full].

[44] Br. of Amici Curiae Sch. Adm'rs at 14-16, *Gloucester Cnty. Sch. Bd.*, 580 U.S. 1168.

[45] David Crary, *Debate Over Transgender Bathroom Access Spreads Nationwide*, Salt Lake Trib. (May 10, 2016), https://archive.sltrib.com/article.php?id=3875520&itype=CMSID [https://web.archive.org/web/20261016144701/https://archive.sltrib.com/article.php?id=3875520&itype=CMSID] (quotation marks omitted).

allowing people to use public restrooms consistent with their gender identity "improve[s] public safety."[46]

Discriminatory restroom policies may in fact *increase* the risk of harassment, violence, and privacy violations against cisgender women, who may be incorrectly perceived as using the "wrong" restroom.[47] In multiple incidents, for example, cisgender women have been harassed or interrogated

---

[46] Letter from William G. Brooks III, Mass. Chiefs of Police Ass'n, & Bryan A. Kyes, Mass. Major City Chiefs, to Sen. William N. Brownsberger & Rep. John V. Fernandes, Joint Comm. on the Judiciary (Oct. 1, 2015), https://www.mass.gov/files/documents/2016/08/wj/ew-le.pdf.

[47] *See, e.g.*, Donald Padgett, *Walmart Fires 6'4" Cisgender Woman Threatened by Man Who Thought She Was Trans*, Advocate (Mar. 28, 2025), https://www.advocate.com/news/walmart-fires-mistaken-trans-woman [https://web.archive.org/web/20261016144815/https://www.advocate.com/news/walmart-fires-mistaken-trans-woman]; Calkins Decl. ¶ 26, 39-43, Dist. Ct. Dkt. No. 47-1; Ettner Opening Decl. ¶¶ 49-53, Dist. Ct. Dkt. No. 3-2; *see also* Brandon Truitt, *Woman Says Security Guard at Liberty Hotel in Boston Confronted Her in Bathroom, Asked to Prove Gender*, CBS News (May 7, 2025), https://www.cbsnews.com/boston/news/women-boston-liberty-hotel-bathroom-gender/ ; [https://web.archive.org/web/20261016142019/https://www.cbsnews.com/boston/news/women-boston-liberty-hotel-bathroom-gender/]; Christopher Wiggins, *Cis Woman Mistaken as Transgender Records Being Berated in Bathroom*, Advocate (May 26, 2023), https://www.advocate.com/news/2022/11/01/cis-woman-mistaken-transgender-records-being-berated-bathroom] [https://web.archive.org/web/20261016143622/https://www.advocate.com/news/2022/11/01/cis-woman-mistaken-transgender-records-being-berated-bathroom]; Matt DeRienzo, *Woman Mistaken for Transgender Harassed in Walmart Bathroom*, News-Times (May 16, 2016), https://www.newstimes.com/local/article/Woman-mistaken-for-transgender-harassed-in-7471666.php [https://web.archive.org/web/20261016150833/https://www.newstimes.com/local/article/Woman-mistaken-for-transgender-harassed-in-7471666.php].

while using public restrooms, and have reported feeling pressured to show their intimate body parts to employees or law enforcement to prove that they belonged in the women's restroom.[48]

### 2. Nondiscriminatory restroom policies neither compromise personal privacy nor require significant expenditures

Contrary to the claims of defendants (*see, e.g.*, Appellants' Opening Br. at 36-38), the experience of amici States shows that gender-inclusive restroom access policies have neither generated privacy issues in women's restrooms nor imposed substantial costs. The risk that women will see others' intimate body parts, or have their intimate body parts seen by others, is not presented by ordinary use of women's restrooms, which usually have only private stalls. As this Court previously explained, "[c]ommon sense tells us that the communal

---

[48] Gerika Mudra, *I Filed a Discrimination Charge for What Happened to Me in a Buffalo Wild Wings Bathroom*, MS Now (Aug. 15, 2025), https://www.msnbc.com/opinion/msnbc-opinion/minnesota-buffalo-wild-wings-server-teen-bathroom-gender-rcna225076?utm_source=substack&utm_medium=email [https://web.archive.org/web/20261016145208/https://www.ms.now/opinion/msnbc-opinion/minnesota-buffalo-wild-wings-server-teen-bathroom-gender-rcna225076?utm_source=substack&utm_medium=email]; Christopher Wiggins, *Cis Woman Confronted by Police Officers in Arizona Walmart Restroom for Looking Too Masculine Speaks Out (Exclusive)*, Advocate (Feb. 28, 2025), https://www.advocate.com/news/lesbian-mistaken-transgender-arizona-walmart [https://web.archive.org/web/20261016143920/https://www.advocate.com/news/lesbian-mistaken-transgender-arizona-walmart].

restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall." *Roe v. Critchfield*, 137 F.4th 912, 924 (9th Cir. 2025) (quotation marks omitted). Moreover, even considering both men's and women's restrooms, concerns about the presence of others in restrooms (whether or not transgender) can be addressed by individuals choosing to utilize a restroom stall or single-occupancy restroom, or by increasing privacy options for all, without singling out transgender people for stigmatizing treatment.

Many amici States have identified a variety of cost-effective options to maximize privacy for all users of restrooms while not singling out transgender individuals for differential treatment. In Washington State, for example, where school districts are required to "allow students to use the restroom that is consistent with their gender identity consistently asserted at school," schools must provide "[a]ny student—transgender or not—who has a need or desire for increased privacy, regardless of the underlying reason," with "access to an alternative restroom (e.g., staff restroom, health office restroom)."[49] This gives all students with privacy concerns "the option to make use of a separate

---

[49] Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* 30 (Wash. Off. of Superintendent of Pub. Instruction 2012), https://ospi.k12.wa.us/sites/default/files/2023-08/prohibiting_discrimination_in_washington_public_schools_february2012revisedsep2019disclaimer_1.pdf.

restroom and have their concerns addressed without stigmatizing any individual student."[50]

Similarly, many other States and the District of Columbia require (and in some instances have required for decades) that all single-occupancy restrooms in places of public accommodation be designated gender-neutral.[51] These laws do not require businesses or schools to build new restrooms. Rather, existing single-occupancy restrooms must remove any signage designating the restroom as "male" or "female" and replace it with signage simply stating "Restroom" or indicating that the single-occupancy restroom is open to people of all genders.

The legislative history of H.B. 752 confirms that enforcement of the Act will not only fail to further defendants' proffered interest in bodily privacy, but also likely exacerbate risks to privacy. A representative of the Idaho Chiefs of Police Association testified in opposition to the enactment of H.B. 752 and expressed concerns that the Act "would create more problems rather than solutions." Groves Decl. ¶ 19(a), Dist. Ct. Dkt. No. 3-3. He explained that the

---

[50] Beauchaine et al., *Prohibiting Discrimination*, *supra*, at 30.

[51] *See, e.g.*, **California**: Cal. Health & Safety Code § 118600(a). **Illinois**: 410 Ill. Comp. Stat. 35/25(c). **New Mexico**: N.M. Stat. § 28-24-3. **New York**: N.Y. Civil Rights Law § 79-p; N.Y. Education Law § 409-m. **Rhode Island**: 23 R.I. Gen. Laws § 23-27.3-702(a). **Vermont**: Vt. Stat. tit. 18, § 1792(a). **District of Columbia**: D.C. Mun. Regs. tit. 4. § 802.2.

Act "would place an unrealistic and absurd burden on Idaho law enforcement officers to somehow know, or be able to readily identify visually [the] biological sex of another human being." *Id.* A representative of the Idaho Fraternal Order of Police also expressed concerns that enforcement of the Act could require very invasive and intrusive tactics to determine "biological sex" and that it would be unreasonable to require people to undress to confirm compliance with the Act. The representative further noted that Idaho law already provides multiple mechanisms for addressing inappropriate or disruptive behavior in restrooms and that the Act created a liability risk for law enforcement officers who make mistakes seeking to enforce the Act. *See id.* ¶ 19(b); *id.* Ex. 4.

## II. ENFORCEMENT OF IDAHO'S H.B. 752 WOULD VIOLATE THE EQUAL PROTECTION CLAUSE

As the Supreme Court has long recognized, the Constitution's guarantee of equal protection prohibits government policies that serve only to express "negative attitudes, or fear," toward people viewed as "different." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). "[V]ague, undifferentiated fears" about a class of persons further no legitimate state interest and cannot be used to "validate" a policy of different treatment. *Id.* at 449. Classifications based on "archaic and overbroad generalizations" similarly do not pass constitutional muster. *See Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) (quotation marks omitted).

H.B. 752 is just such a policy. It imposes criminal penalties on anyone who "knowingly and willfully enters a restroom or changing room in a government-owned building or a place of public accommodation . . . that is designated for use by the opposite biological sex." Idaho Code § 18-4117(1). Critically, the Act does not even define "biological sex," meaning that law enforcement could arbitrarily interpret that term to refer to anatomy, chromosomes, or something else. And its criminal prohibition is sweeping: It applies to all sex-designated restrooms, whether single-occupancy or multi-occupancy.

Regardless of what standard of judicial review applies, the law's categorical prohibition on transgender individuals using restrooms that align with their gender identity violates equal protection because it cannot survive even rational basis review. First, the Act does not advance safety. As explained, there is no evidence that gender-inclusive restroom policies increase the number or frequency of criminal incidents in public restrooms. And the Act's discriminatory prohibition may *increase* the risk of harassment and violence against some cisgender women, who may be perceived as using the "wrong" restroom. See *supra* at I.B.1. As the district court aptly noted, an array of Idaho statutes already addresses the actual safety concerns raised by defendants. (ER-21.)

Second, as explained, the Act does not advance any concrete interest in bodily privacy—which is already protected in women's restrooms by stall doors in any event. *See Roe*, 137 F.4th at 924. And the Act may in fact *increase* risks to bodily privacy. In the case of plaintiffs, for instance, the Act requires a transgender male who is perceived as male to use the women's restroom, and it requires a transgender female who is perceived as female to use the men's restroom. The entry of a person who appears male into a women's restroom, or of a person who appears female into a men's restroom, is more likely to increase privacy concerns for other users than to avoid such concerns. And, because enforcement of this law would likely require increased restroom policing, cisgender women in Idaho may suffer further injury to their privacy and dignity if they are required to prove that they are female to enter the women's restroom. Indeed, multiple law enforcement organizations opposed the Act because it may require intrusive and evasive enforcement measures. See *supra* at I.B.2.

Third, the breadth of H.B. 752's criminal prohibition is powerful evidence that the Act was motivated by impermissible animus against transgender people. *See Romer v. Evans*, 517 U.S. 620, 632-33 (1996). The Act reaches conduct far removed from defendants' asserted safety and privacy justifications. For example, the Act imposes criminal penalties on individuals who use single-occupancy restrooms designated for the opposite "biological

sex." But there are no plausible safety- or privacy-related justifications for criminalizing the use of a single-occupancy facility, where the individual using the restroom is necessarily alone and unable to interfere with the safety or privacy of any other individuals. The absence of any plausible purpose for the prohibition on the use of single-occupancy restrooms reinforces that the Act's sole purpose is to target transgender individuals and deny their gender identity. Indeed, Idaho's other discriminatory restroom laws concerning restroom access in K-12 schools and universities at least require reasonable accommodations for transgender people, *see* Idaho Code Ann. §§ 33-6705; 67-9802(6), but H.B. 752 conspicuously omits any requirement that would facilitate access to restrooms for transgender people.

More generally, the experiences of amici States belie the Act's key assumption that permitting transgender people to utilize restrooms consistent with their gender identity will threaten safety or privacy. As explained, in many amici States, transgender individuals have long been permitted to use restrooms consistent with their gender identity without any corresponding decrease in safety or diminution of privacy. *Supra* at I.B. And many amici States have been able to effectively protect restroom privacy for *all*, such as by expanding access to existing single-occupancy restrooms. *Id.* By contrast, because H.B. 752 does not provide any additional protections for safety or privacy that were not available under the preexisting legal scheme allowing

sex-separated restrooms, the law serves only to stigmatize and concretize "vague, undifferentiated fears" about transgender students, thereby denying those students the equal protection of the laws. *City of Cleburne*, 473 U.S. at 449.

These aspects of H.B. 752 are also quite different from the Idaho Fairness in Women's Sports Act, which the Supreme Court recently upheld. *See West Virginia v. B. P. J.*, 146 S. Ct. 2356, 2367 (2026). In upholding that law, the Supreme Court repeatedly emphasized that the "distinctive" sports context was "crucial" to its reasoning in *B. P. J.* 146 S. Ct. at 2376-77; *see id.* at 2378, 2381 (repeatedly emphasizing "the sports context" of the case). By contrast, in the context of restrooms, the experiences of amici States show that the law may actually exacerbate the privacy and safety concerns that defendants claim the law is intended to address.

## CONCLUSION

This Court should affirm the decision below.

Dated: Seattle, Washington
October 16, 2026

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*

BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
MARK S. GRUBE
*Senior Assistant Solicitor General*
ELIZABETH A. BRODY
*Assistant Solicitor General*
28 Liberty Street
New York, NY 10005
(212) 416-8028

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

NICK BROWN
*Attorney General*
*State of Washington*

By: *s/ Neal Luna*
Neal Luna
Assistant Attorney General

PATRICIO MARQUEZ
*Division Chief*
*Wing Luke Civil Rights Division*
NEAL LUNA
*Assistant Attorney General*

P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

*(Counsel listing continues on next page.)*

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609-1001

JENNIFER DAVENPORT
*Attorney General*
*State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

JAY JONES
*Attorney General*
*Commonwealth of Virginia*
202 North 9th Street
Richmond, VA 23219

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-4551

I am the attorney or self-represented party.

**This brief contains** 6,094 **words,** including ______ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ______.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Neal Luna **Date** 10/16/26

*(use "s/[typed name]" to sign electronically-filed documents)*